**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**J.P. MORGAN CHASE BANK, N.A.**                                                        **APPELLANT**

**Vs.**                                **CASE NO. 3:11-cv-00249  BRW (LEAD CASE)**

**DANIEL L. JOHNSON, and**                                         **APPELLEES**
**SUSAN D. JOHNSON**

_____

**J.P. MORGAN CHASE BANK, N.A.**                                          **APPELLANT**

**Vs.**                                **CASE NO. 3:11-cv-00250  BRW**

**TRACY L. ESTES**                                                         **APPELLEE**

_____

**J.P. MORGAN CHASE BANK, N.A.**                                          **APPELLANT**

**Vs.**                                **CASE NO. 3:11-cv-00251  BRW**

**TAMMY R. PEEKS**                                               **APPELLEE**

_____

APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

HONORABLE AUDREY R. EVANS
UNITED STATES BANKRUPTCY JUDGE

_____

**BRIEF OF APPELLANT**
**J.P. MORGAN CHASE BANK, N.A.**

_____

DANIEL S. CONNOLLY, 2265569
RACHEL B. GOLDMAN, 2896272
BRACEWELL & GIULIANI, LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
(212) 508-6100 (t)
(212) 508-6101 (f)
daniel.connolly@bgllp.com
rachel.goldman@bgllp.com

DAVID L. WILLIAMS, 78168
KATHERINE M. HINGTGEN, 2006223
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201
(501) 975-3000 (t)
(501) 975-3001 (f)
david.williams@kutakrock.com
katherine.hingtgen@kutakrock.com

SAMUEL M. STRICKLIN, 19397050
BRACEWELL & GIULIANI, LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202-2711
(214) 468-3800 (t)
(214) 468-3888 (f)
samuel.stricklin@bgllp.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES PRESENTED
AND APPLICABLE STANDARDS OF APPELLATE REVIEW ................. 2

STATEMENT OF THE CASE.............................................................. 3

      A.     The Underlying Bankruptcy Proceedings ................................... 4

           1.     Estes Bankruptcy ........................................... 4

           2.     Johnson Bankruptcy........................................ 5

           3.     Peeks Bankruptcy........................................... 6

      B.     Consolidated Hearing On JP Morgan's Objections
           To Debtors' Respective Chapter 13 Plans ................................... 6

      C.     The Bankruptcy Court's Decision ........................................... 7

SUMMARY OF ARGUMENT ........................................................... 9

ARGUMENT ................................................................................. 10

    I.     As A National Bank, JP Morgan Is Authorized
           To Do Business Under SFA § 18-50-117 ................................... 10

      A.     The Bankruptcy Court Misconstrued The Parties' Stipulation ................. 11

      B.     JP Morgan Is Authorized To Do Business In Arkansas ........................... 12

      C.     Use Of The SFA Requires Only That JP Morgan
           Be Authorized To Do Business In Arkansas. ........................................... 16

           1.     The Plain Meaning Of The SFA Is Clear....................................... 17

           2.     The SFA Does Not Require A Certificate
               Of Authority...................................................................... 18

           3.     Legislative History And Related Statutes
               Confirm The Plain Meaning ...................................................... 20

# TABLE OF CONTENTS
## (continued)

**Page**

      a.    2003 Amendments Demonstrate Legislative Intent To Include National Banks Among Those Authorized Under § 18-50-117 ...............20

      b.    2011 Amendments To The SFA Affirm The Legislature's Intent ........................22

      c.    Other Arkansas Statutes Confirm The Legislative Intent ........................................23

    4.    JP Morgan's Interpretation Of The SFA Is Consistent With the Legislature's Policy Goals ...........................26

II.    The National Bank Act Preempts The SFA's Authorization Requirement.......................................................................28

    A.    Presumption Regarding Preemption And Congressional Intent Under The National Bank Act ................................29

      1.    Presumption Regarding Preemption ...............................29

      2.    Congressional Intent ...................................................30

    B.    Express And Implied Preemption of SFA § 18-50-117...........................32

      1.    The National Bank Act Expressly Preempts Arkansas' State Law Requiring Authorization .............................33

      2.    The National Bank Act Implicitly Preempts SFA § 18-50-117.........................36

III.    The SFA Violates The Commerce Clause ...........................................42

    A.    The SFA Overtly Discriminates Against National Banks .........................43

    B.    Even If The Discriminatory Effects Are Incidental, The Burden Imposed On Interstate Commerce Is Excessive In Relation To The Putative Local Benefits ...............................44

IV.    The Bankruptcy Court Violated Bankruptcy Procedure And Deprived JP Morgan Of Due Process By Improperly Rejecting The Proof Of Claims...............................................................45

V.    The Bankruptcy Court Erred In Awarding Debtors Their Attorneys' Fees ......................................................................47

CONCLUSION...........................................................................................49

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*770 PPR, LLC v. TJCV Land Trust,*
    30 So. 3d 613 (Ct. App. Fl. 4th Dist. 2010)........................................................38

*Alliance Mortg. Co. v. Rothwell,*
    900 P.2d 601 (Cal. 1995) ...........................................................................41

*Anderson Nat'l Bank v. Luckett,*
    321 U.S. 233 (1944).................................................................................37

*Arkansas Tobacco Control Bd. v. Santa Fe Natural Tobacco Co., Inc.,*
    199 S.W.3d 656 (Ark. 2004).......................................................................43

*Arnold Tours, Inc. v. Camp,*
    472 F.2d 427 (1st Cir. 1972).......................................................................15

*Ass'n of Banks in Ins., Inc. v. Duryee,*
    270 F.3d 397 (6th Cir. 2001) .....................................................................40

*Ass'n of Banks in Ins., Inc. v. Duryee,*
    55 F. Supp. 2d 799 (S.D. Ohio 1999) ....................................................32, 37

*Bank of Am., Nat'l Trust & Sav. Ass'n v. Lima,*
    103 F. Supp. 916 (D. Mass. 1952) ......................................................14, 19

*Bank of America v. City & Cnty. of San Francisco,*
    309 F.3d 551 (9th Cir. 2002) .....................................................................29

*Bank One, Utah v. Guttau,*
    190 F.3d 844 (8th Cir. 1999) .......................................................16, 30, 34, 37

*Barnett Bank of Marion Cnty., N.A. v. Nelson,*
    517 U.S. 25 (1996).............................................................29, 30, 35, 36, 37, 40

*Bullion v. Aetna Ins. Co.,*
    237 S.W. 716 (Ark. 1922).........................................................................21

*California Golf, LLC v. Cooper,*
    378 Cal Rptr. 3d 153 (Cal. Ct. App. 2008)......................................................41

*Citibank v. Eckmeyer,*
    No. 2008-P-0069, 2009 WL 1452614 (Ct. App. Ohio 2009) ...............................38

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Clarke v. Sec. Indus. Ass'n,*
479 U.S. 388 (1987) .......................................................................................... 34

*Cox v. ReconTrust Co., N.A.,*
No. 10-CV-492, 2010 WL 2519716 (D. Utah June 11, 2010) ...... 19, 31, 35, 36, 38,
........................................................................................................................... 39

*Cox v. ReconTrust Co., N.A.,*
No. 10-CV-492, 2011 WL 835893 (D. Utah Mar. 3, 2011) ........................... 14, 32

*Cuomo v. Clearing House Ass'n, LLC,*
--- U.S. ----, 129 S. Ct. 2710 (2009) .............................................................. 32, 36

*DaimlerChrysler Corp. v. Smelser,*
289 S.W.3d 466 (Ark. 2008) ............................................................................ 20

*Easton v. Iowa,*
188 U.S. 220 (1903) ...................................................................................... 31, 40

*Excelsior Funds, Inc. v. JP Morgan Chase Bank, N.A.,*
470 F. Supp. 2d 312 (S.D.N.Y. 2006) ............................................................... 12

*FDIC v. Union Entities (In re Be-Mac Transport Co.),*
83 F.3d 1020 (8th Cir. 1996) ........................................................................... 46

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,*
458 U.S. 141 (1982) .......................................................................................... 34

*First Nat'l Bank of E. Arkansas v. Taylor,*
907 F.2d 775 (8th Cir. 1990) ................................................................... passim

*First Nat'l Bank in Plant City, Fla. v. Dickinson,*
396 U.S. 122 (1969) .................................................................................. 26, 31, 40

*First Nat'l Bank of Lewisville, Ark. v. First Nat'l Bank of Clinton, Kentucky,*
258 F.3d 727 (8th Cir. 2001) ........................................................................... 27

*First Nat'l Bank of Logan, Utah v. Walker Bank & Trust Co.,*
385 U.S. 252 (1966) ...................................................................................... 31, 40

*Florida Lime & Avocado Growers, Inc. v. Paul,*
373 U.S. 132 (1963) .......................................................................................... 33

*Franklin Nat'l Bank v. New York,*
347 U.S. 373 (1954) ...................................................................................... 15, 16

iv

<u>TABLE OF AUTHORITIES</u>
**(continued)**

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992)........................................................................................32, 33

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000)............................................................................................34

*Hallas v. Ameriquest Mortg. Co.,*
    No. CV-04-433, 2005 WL 2044523 (D. Or. Aug. 24, 2005)..............................41

*Hanners v. Giant Oil Co.,*
    284 S.W.3d 468 (Ark. 2008)..............................................................................48

*Henson v. Fleet Mortg. Co.,*
    892 S.W.2d 250 (Ark. 1995)..........................................................................17, 18

*Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.,*
    471 U.S. 707 (1985)............................................................................................34

*Hines v. Davidowitz,*
    312 U.S. 52 (1941)..........................................................................................33, 36

*In re Aurora Dairy Corp. Organic Milk Marketing and Sales Practices Litig.,*
    621 F.3d 781 (8th Cir. 2010) .............................................................................29

*In re Hibernia Nat'l Bank,*
    21 S.W.3d 908 (Ct. App. Tex. 2002) ..................................................................38

*In re Hollingworth,*
    453 B.R. 32 (Bankr. D. Mass. 2011) ..................................................................12

*In re Miller,*
    140 B.R. 499 (Bankr. E.D. Ark. 1992) ...............................................................47

*Indiana Nat'l Bank v. Roberts,*
    326 So. 2d 802 (Sup. Ct. Miss. 1976).................................................................38

*Jones v. Rath Packing Co.,*
    430 U.S. 519 (1977)............................................................................................32

*Kaggen v. I.R.S.,*
    71 F.3d 1018 (2d Cir. 1995)...............................................................................12

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) .............................................................................12

*Mamo Transp., Inc. v. Williams,*
    289 S.W.3d 79 (Ark. 2008).................................................................................17

# TABLE OF AUTHORITIES
## (continued)

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
    439 U.S. 299 (1978)...........................................................................................32

*Martinez v. Wells Fargo Home Mortg., Inc.*,
    598 F.3d 549 (9th Cir. 2010) .....................................................................34, 36

*Miller v. King*,
    223 U.S. 505 (1912)......................................................................................15, 33

*Monroe Retail, Inc. v. RBS Citizens, N.A.*,
    589 F.3d 274 (6th Cir. 2009) ...............................................................................29

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950).............................................................................................47

*Nat'l Bank of Commerce of El Dorado, Arkansas v. Dow Chem. Co.*,
    165 F.3d 602 (8th Cir. 1999) ................................................................................3

*Nat'l Bank v. Dearing*,
    91 U.S. 29 (1875)................................................................................................30

*Nat'l City Bank of Indiana v. Bakke*,
    No. 3-04-3914, 2005 WL 3544960 (D.N.J. Dec. 22, 2005) ................................38

*Nat'l City Bank of Indiana v. Turnbaugh*,
    463 F.3d 325 (4th Cir. 2006) ..............................................................................38

*Nationsbanc Mortg. Corp. v. Hopkins*,
    114 S.W.3d 757 (Ark. App. 2003)......................................................................48

*NationsBank of N. Carolina, N.A. v. Variable Annuity Life Ins. Co.*,
    513 U.S. 251 (1995)............................................................................................13

*New Mexico ex rel. Foy v. Vanderbilt Cap. Advisors, LLC*,
    No. CIV 09-0178, 2009 WL 3672921 (D.N.M. Apr. 13, 2009)...........................12

*Norwest Bank Minnesota, Nat'l Ass'n v. Sween Corp.*,
    118 F.3d 1255 (8th Cir. 1997) .................................................................34, 35, 38

*O'Neal v. State Farm Fire & Cas. Co.*,
    630 F.3d 1075 (8th Cir. 2011) ..............................................................................3

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*,
    511 U.S. 93 (1994)....................................................................................42, 43, 44

*PACCAR Fin. Corp. v. Mackey*,
    122 F.3d 1134 (8th Cir. 1997) ..............................................................................3

# TABLE OF AUTHORITIES
## (continued)

*Pagosa Lakes Prop. Owners' Ass'n, Inc. v. Fairfield Pagosa, Inc. (In re Fairfield Pagosa, Inc.)*,
   97 F.3d 247 (8th Cir. 1996) ...................................................................2

*Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*,
   545 F. Supp. 2d 845 (E.D. Ark. 2008) .................................................25

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970)................................................................................43

*R & M Oil & Supply, Inc. v. Saunders*,
   307 F.3d 731 (8th Cir. 2002) ................................................................42

*Ramirez v. White*,
   38 S.W.3d 298 (Ark. 2001).....................................................................17

*Royal v. Kautzky*,
   375 F.3d 720 (8th Cir. 2004) ..................................................................3

*S. Union Co. v Missouri Pub. Serv. Comm'n*,
   289 F.3d 503 (8th Cir. 2002) ...................................................................3

*Sanchez v. Northwest Airlines, Inc.*,
   659 F.3d 671 (8th Cir. 2011) ................................................................47

*Simmons First Bank of Arkansas v. Bob Callahan Servs., Inc.*,
   13 S.W.3d 570 (Ark. 2000).....................................................................18

*Simmons v. Savel (In re Simmons)*,
   765 F.2d 547 (5th Cir. 1985) ................................................................46

*Sinclair v. Hawke*,
   314 F.3d 934 (8th Cir. 2003) ................................................................13

*Springfield Television, Inc. v. City of Springfield, Mo.*,
   462 F.2d 21 (8th Cir. 1972) ..................................................................12

*State Nat'l Bank of Conn. v. Laura*,
   45 Misc.2d 430 (Cnty. Ct. Westchester Cnty. N.Y. 1965) ...................38

*State v. Trulock*,
   160 S.W. 516 (Ark. 1913)......................................................................21

*Steward v. Atl. Nat'l Bank of Boston*,
   27 F.2d 224 (9th Cir. 1928) ..................................................................19

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Thompson v. Wal-Mart Stores, Inc.,*
    472 F.3d 515 (8th Cir. 2006) ...............................................................3

*Tiffany v. Nat'l Bank of Missouri,*
    85 U.S. 409, 21 L. Ed. 862 (1873) ......................................................14

*Union Nat'l Bank of Arkansas v. Nichols,*
    807 S.W.2d 36 (Ark. 1991).....................................................................41

*United States v. Auginash,*
    266 F.3d 781 (8th Cir. 2001) ................................................................3

*United States v. Locke,*
    529 U.S. 89 (2000)..................................................................................29

*United States v. Robinson,*
    608 F.3d 379 (8th Cir. 2010) ...........................................................3, 12

*Univ. Am. Mortg. Co. v. Bateman (In re Bateman),*
    331 F.3d 821 (11th Cir. 2003) .............................................................46

*Universal Title Ins. Co. v. United States,*
    942 F.2d 1311 (8th Cir. 1991) .............................................................42

*Vuitton et Fils, S.A. v. J. Young Enterprises, Inc.,*
    609 F.2d 1335 (9th Cir. 1979) .............................................................12

*Wachovia Bank, N.A. v. Burke,*
    414 F.3d 305 (2d Cir. 2005)......................................................29, 39, 40

*Wal-Mart Stores, Inc. v. D.A.N. Joint Venture III, L.P.,*
    288 S.W.3d 627 (Ark. 2008).................................................................20

*Watters v. Wachovia Bank, N.A.,*
    550 U.S. 1 (2007)......................................................................... passim

*Weitz Co., LLC v. Lloyd's of London,*
    574 F.3d 885 (8th Cir. 2009) ...............................................................42

*Wyeth v. Levine,*
    555 U.S. 555 (2009)........................................................................29, 30

## Statutes

11 U.S.C. § 502..........................................................................................45

12 U.S.C. §§ 1 *et seq.*..........................................................................2, 8

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

12 U.S.C. § 24 ..............................................................................................13, 15, 31

12 U.S.C. § 25b ..................................................................................................35, 40

12 U.S.C. § 26 ..............................................................................................13, 31, 35

12 U.S.C. § 27 ..............................................................................................13, 31, 35

12 U.S.C. § 42 ..............................................................................................14, 32, 35

12 U.S.C. § 93a ..................................................................................................34, 35

12 U.S.C. § 371 ............................................................................................14, 34, 35

12 U.S.C. § 481 ..........................................................................................................13

12 U.S.C. § 484 ............................................................................................31, 34, 35

28 U.S.C. § 157 ..........................................................................................................47

28 U.S.C. § 158 ............................................................................................................1

Ark. Code Ann. §§ 4-27-1501 ......................................................................8, 18, 19

Ark. Code Ann. § 4-27-1505 ....................................................................................39

Ark. Code Ann. § 16-4-101 ......................................................................................27

Ark. Code Ann. § 16-22-308 ..................................................................................9, 48

Ark. Code Ann. §§ 17-24-501 ..................................................................................36

Ark. Code Ann. § 18-50-102 ..............................................................................21, 27

Ark. Code Ann. § 18-50-116 ........................................................................17, 18, 46

Ark. Code Ann. § 18-50-117 ............................................................................ passim

Ark. Code Ann. § 23-46-205 ....................................................................................24

Ark. Code Ann. § 23-48-1001 ....................................................................19, 23, 24, 26

Ark. Code Ann. §§ 23-48-1003 ................................................................................18

# Rules

Rule 8001(a) of the Federal Rules of Bankruptcy Procedure ......................................1

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Rule 3007(a) of the Federal Rules of Bankruptcy Procedure ......................................45, 46

**Regulations**

12 C.F.R. § 1.1 .................................................................................................................2

12 C.F.R. § 5.4 ......................................................................................................13, 35

12 C.F.R. § 5.5 ......................................................................................................13, 35

12 C.F.R. § 5.20 ....................................................................................................13, 35

12 C.F.R. § 7.1004 ........................................................................................................23

12 C.F.R. § 7.4000 .......................................................................................31, 34, 35

12 C.F.R. § 25.12 ..........................................................................................................23

12 C.F.R. § 34.3 ....................................................................................................14, 35

12 C.F.R. § 34.4 ............................................................................................14, 35, 36

69 Fed. Reg. 1904-1 (Jan. 13, 2004)...................................................................36, 39, 44

OCC Interpretive Letter No. 646, CCH Fed. Banking L. Rep.
    ¶ 83,555, 1994 WL 568014 (Apr. 12, 1994).............................................15, 33, 34

OCC Interpretive Letter No. 721, CCH Fed. Banking L. Rep.
    ¶ 81,036, 1996 WL 306098 (Mar. 6, 1996) ........................................................25

OCC Interpretive Letter No. 749, 1997 WL 268792 (Sept. 13, 1996) .............................38

OCC Interpretive Letter. No. 957, 2003 WL 23221435 (Jan. 27, 2003) ..........................38

## JURISDICTIONAL STATEMENT

Pursuant to Federal Rule of Bankruptcy Procedure 8001(a) and 28 U.S.C. § 158, the United States District Court for the Eastern District of Arkansas, Jonesboro Division, has jurisdiction over J.P. Morgan Chase Bank, N.A.'s ("JP Morgan") appeal from the Memorandum Opinion and Order Overruling Objections to Confirmation, dated September 28, 2011, a consolidated decision issued by the Honorable Audrey R. Evans of the United States Bankruptcy Court for the Eastern District of Arkansas, Jonesboro Division, in the Chapter 13 cases of (1) *In re Tracy Lea Estes*, No. 3:10-bk-16541; (2) *In re Daniel Lynn Johnson and Susan Diane Johnson*, No. 3:10-bk-19119; and (3) *In re Tammy Renae Peeks*, No. 3:11-bk-10602.

## STATEMENT OF THE ISSUES PRESENTED
## AND APPLICABLE STANDARDS OF APPELLATE REVIEW

The issues presented by this appeal and the respective standards of review are as follows:

1.      Whether the bankruptcy court erred in concluding that JP Morgan, a national bank authorized by federal law to conduct banking and related business in every state, was not authorized to do business in the State of Arkansas and was not in compliance with the authorized-to-do-business requirement of the Arkansas Statutory Foreclosure Act of 1987, Ark. Code Ann. §§ 18-50-101 *et seq.* ("SFA").

2.      Whether the bankruptcy court erred in concluding that JP Morgan stipulated that it was not authorized to do business in the State of Arkansas.

3.      Whether the bankruptcy court erred in finding that the authorized-to-do-business requirement of the SFA is not preempted by the National Bank Act, 12 U.S.C. §§ 1 *et seq.*, and related regulations promulgated by the Office of the Comptroller of the Currency, 12 C.F.R. §§ 1.1 *et seq.*

4.      Whether the authorized-to-do-business requirement of the SFA violates the Commerce Clause of the United States Constitution.

5.      Whether the bankruptcy court committed procedural error and violated JP Morgan's due process rights by permitting the Debtor-Appellees to challenge, without filing an objection, JP Morgan's presumptively valid proofs of claim.

6.      Whether the bankruptcy court erred in finding that the Debtor-Appellees should be awarded attorney fees.

When sitting as an appellate court, the district court reviews the bankruptcy court's legal conclusions *de novo* and reviews findings of fact for clear error. *See Pagosa Lakes Prop. Owners' Ass'n, Inc. v. Fairfield Pagosa, Inc. (In re Fairfield Pagosa, Inc.)*, 97 F.3d 247, 252 (8th Cir. 1996). Issues of statutory interpretation and conclusions concerning the application of statutes are reviewed *de novo*. *See O'Neal v. State Farm Fire & Cas. Co.*, 630 F.3d 1075, 1077 (8th Cir. 2011) ("[W]e review *de novo* questions of statutory interpretation and examine the text of the statute as a whole by considering its context, object, and policy.") (internal quotations omitted); *see also United States v. Auginash*, 266 F.3d 781, 783 (8th Cir. 2001). Issues regarding preemption, the Commerce Clause and due process pose questions of law that also are reviewed *de novo*. *See Royal v. Kautzky*, 375 F.3d 720, 722 (8th Cir. 2004); *S. Union Co. v Missouri Pub. Serv. Comm'n*, 289 F.3d 503, 505 (8th Cir. 2002); *Nat'l Bank of Commerce of El Dorado, Arkansas v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999). Factual mistakes regarding stipulations are reviewed for clear error. *See United States v. Robinson*, 608 F.3d 379, 381-82 (8th Cir. 2010); *PACCAR Fin. Corp. v. Mackey*, 122 F.3d 1134, 1136 (8th Cir. 1997). Awards of attorneys' fees are reviewed *de novo* for legal issues and for abuse of discretion as to amount. *See Thompson v. Wal-Mart Stores, Inc.*, 472 F.3d 515, 516 (8th Cir. 2006).

## <u>STATEMENT OF THE CASE</u>

On September 28, 2011, the Honorable Audrey R. Evans of the United States Bankruptcy Court for the Eastern District of Arkansas issued a Memorandum Opinion and Order Overruling Objections to Confirmation ("Opinion & Order") which overruled objections to Chapter 13 plan confirmations that JP Morgan or its predecessor-in-interest, Chase Home Finance, LLC ("Chase"), filed in each of the three bankruptcy proceedings at issue in this appeal.[1] Estes

---

[1] Debtors' counsel and others have recently filed a number of actions on behalf of other debtors and proposed classes challenging past payment of non-judicial foreclosure fees and

Bankr. Dkt. ("Estes Dkt.") No. 79; Johnson Bankr. Dkt. ("Johnson Dkt.") No. 120; Peeks Bankr.

Dkt. ("Peeks Dkt.") No. 80.  JP Morgan seeks reversal of the bankruptcy court's determination

that JP Morgan "was not in compliance with the authorized-to-do-business requirement of the

Statutory Foreclose Act when it conducted" non-judicial foreclosures of the Debtor-Appellees'

("Debtors") property arising out of residential mortgage defaults, and therefore was not entitled

to payment of foreclosure fees and costs that it incurred during the non-judicial foreclosure

proceedings.  Opinion & Order at 23.

### A.    The Underlying Bankruptcy Proceedings

This appeal concerns three unrelated bankruptcy proceedings assigned to Judge Evans

that were consolidated for purposes of the hearing on JP Morgan's objections.  The three

bankruptcy proceedings are: (1) *In re Tracy Lea Estes*, No. 3:10-bk-16541; (2) *In re Daniel Lynn*

*Johnson and Susan Diane Johnson*, No. 3:10-bk-19119; and (3) *In re Tammy Renae Peeks*, No.

3:11-bk-10602 (collectively, the "Debtors' Bankruptcies").  The underlying facts of the

individual bankruptcy proceedings have little relevance to the issues on appeal, and will

therefore be addressed only briefly.

### 1.    Estes Bankruptcy

Chase initiated non-judicial foreclosure proceedings against real property belonging to

Tracy Estes in accordance with the Arkansas SFA.  On September 8, 2010, Ms. Estes filed a

---

costs, as well as the validity of the foreclosures themselves, based upon the bankruptcy court's
decision and/or upon the same theory, that national banks are not in compliance with the SFA's
authorized-to-do-business requirement.  *See Rivera v. J.P. Morgan Chase Bank, N.A.*, No. 3:11-
cv-00198 (E.D. Ark. filed Oct. 3, 2011); *Esaw v. Bank of America, N.A., et al.*, 4:11-ap-01281
(Bankr. E.D. Ark. filed Nov. 3, 2011); *Mhoon, et al. v. Deutsche Bank National Trust Company*,
4:11-cv-04092 (Bankr. E.D. Ark. filed Oct. 3, 2011); *McCracken, et al. v. J.P. Morgan Chase
Bank, N.A.*, No. 3:11-ap-01249 (Bankr. E.D. Ark. filed Oct. 1, 2011); *Diaz v. Chase Home
Finance, LLC, et al.*, No. 5:11-cv-05215 (W.D. Ark. filed Sept. 7, 2011); *Jones, et al. v. J.P.
Morgan Chase Bank, N.A.*, No. 3:11-cv-00172 (E.D. Ark. filed Aug. 25, 2011); *Creel, et al. v.
Chase Home Finance, LLC, et al.*, No. 2:11-ap-07046 (Bankr. W.D. Ark. filed Mar. 15, 2011).

Chapter 13 bankruptcy petition in the bankruptcy court, which stayed the foreclosure.  *See* Opinion & Order at 4; Estes Dkt. No. 1.  On September 21, 2010, Ms. Estes filed a Chapter 13 plan that listed an arrearage of $8,000 owed to Chase.  Estes Dkt. No. 11 at 3.  On October 20, 2010, Chase filed an objection to plan confirmation, asserting that Ms. Estes in fact owed an arrearage of $10,537.36.  Estes Dkt. No. 20.  Thereafter, Chase filed a proof of claim for a secured debt of $37,041.96 which listed $10,509.36 in arrearages, of which $2,713.70 was attributable to foreclosure fees and costs.[2]  Estes Claim No. 5-1.

Ms. Estes never filed an objection to Chase's proof of claim.  More than eight months later, on July 12, 2011, Ms. Estes filed a response to Chase's plan confirmation objection that generally denied Chase's objection and specifically admitted that Chase filed proofs of claim in the amounts indicated.  Estes Dkt. No. 62.  On July 14, 2011, Chase transferred its proof of claim to JP Morgan.  Estes Dkt. No. 66.

## 2.  **Johnson Bankruptcy**

Chase initiated non-judicial foreclosure proceedings against real property belonging to Daniel and Susan Johnson in accordance with the Arkansas SFA.  On December 20, 2010, the Johnsons filed a Chapter 13 bankruptcy petition simultaneously with a Chapter 13 plan, which stayed the foreclosure proceedings.  *See* Opinion & Order at 3; Johnson Dkt. No. 1.  The Johnsons' Chapter 13 plan included an arrearage of $7,485 to Chase.  Johnson Dkt. No. 2.  On March 2, 2011, Chase filed an objection to plan confirmation, contending that the Johnsons actually owed $14,072.81 in arrears.  Johnson Dkt. No. 29.  On March 2, 2011, Chase filed a proof of claim for a secured debt of $187,468.21, which listed $14,072,81 in arrearages, $1,380 of which related to foreclosure fees and costs.  Johnson Claim No. 18-1.

---

[2] On May 25, 2011, Chase filed an amended proof of claim adjusting the arrearage amount from $10,509.36 to $10,502.22.  Estes Claim No. 5-2.

The Johnsons never filed an objection to Chase's proof of claim. Rather, on July 13, 2011, the Johnsons filed a response to Chase's plan confirmation objection that generally denied Chase's objection and specifically admitted that Chase filed a proof of claim in the amounts indicated. Johnson Dkt. No. 100. On July 4, 2011, Chase transferred its proof of claim to JP Morgan. Johnson Dkt. No. 95.

### 3.    Peeks Bankruptcy

JP Morgan initiated non-judicial foreclosure proceedings against real property belonging to Tammy Renae Peeks in accordance with the Arkansas SFA. On January 31, 2011, Ms. Peeks filed a Chapter 13 bankruptcy petition, which stayed the foreclosure proceedings. *See* Opinion & Order at 3; Peeks Dkt. No. 1. Ms. Peeks then filed a Chapter 13 plan that listed an arrearage owed to JP Morgan for $7,500. Peeks Dkt. No. 12. On March 21, 2011, JP Morgan filed an objection to Ms. Peeks' Chapter 13 plan, asserting that Ms. Peeks misstated the arrearage by roughly $2,500. Peeks Dkt. No. 22. On July 13, 2011, JP Morgan filed a proof of claim for a secured debt of $133,172.09, which included $9,516.72 in arrearages, of which $2,400.02 represented incurred foreclosure fees and costs. Peeks Claim No. 13-1.

Ms. Peeks never filed an objection to JP Morgan's proof of claim. On July 12, 2011, Ms. Peeks filed a response to JP Morgan's plan confirmation objection that generally denied JP Morgan's objection and specifically admitted that JP Morgan filed a proof of claim in the amounts indicated. Peeks Dkt. No. 57.

### B.    Consolidated Hearing On JP Morgan's Objections To Debtors' Respective Chapter 13 Plans

On July 14, 2011, Judge Evans held a consolidated hearing regarding JP Morgan's objections to the respective Chapter 13 plans filed in each of the Debtors' Bankruptcies. Estes

Dkt. No. 69; Johnson Dkt. No. 108; Peeks Dkt. No. 64.  At the start of the hearing, Debtors'

counsel offered the following on-the-record stipulation:

> Chase's counsel has stipulated that . . . JP Morgan Chase Bank, N.A. . . . is not a
> bank registered with the Secretary of State as an entity to conduct business in
> Arkansas and is not registered as an out of state bank doing business in Arkansas
> with the Arkansas Bank Department; clarify that they are not registered with
> either entity.

Hearing Transcript, dated July 14, 2011 ("Hr'g Tr.") at 7:1-9 (emphasis added).

During the hearing, Debtors' counsel asserted, for the first time, that JP Morgan was not

permitted to collect foreclosure costs and fees because JP Morgan was not "authorized to do

business" in Arkansas, as required by Ark. Code Ann. § 18-50-117.  *Id.* at 10:13-19; 11:8-10.

According to Debtors' counsel, authorization under the SFA mandates registration with the

Arkansas Secretary of State and/or the Arkansas State Bank Department.  *Id.* at 7:1-12; 17:25-

18:1; 22:16-18; 23:1-3; 25:8-12; 29:21-30:3.  In response, counsel for JP Morgan argued, among

other things, that JP Morgan was authorized to conduct business in Arkansas, JP Morgan was in

compliance with the SFA, and that, alternatively, the SFA provision was preempted by federal

law, including the NBA.  *Id.* at 9:23-10:1; 24:5-13; 25:19-26:2; 27:23-28:8.

### C.    The Bankruptcy Court's Decision

In its Opinion & Order, as a threshold matter, the bankruptcy court addressed the

question of "whether J.P. Morgan was qualified to use Arkansas' non-judicial foreclosure

procedure when it initiated the foreclosure proceedings against these Debtors."  Opinion & Order

at 5.  The bankruptcy court concluded that JP Morgan "was not in compliance with the

authorized-to-do-business requirement of the Statutory Foreclose Act when it conducted" the

non-judicial foreclosures of the Debtors' property, and therefore was not entitled to payment of

foreclosure fees and costs that it had incurred during the non-judicial foreclosure proceedings.

Opinion & Order at 23.  Thus, the bankruptcy court overruled JP Morgan's objection.

The bankruptcy court's decision is premised upon the court's misunderstanding of the parties' oral stipulation entered into during the consolidated hearing.  Based upon that misunderstanding, the bankruptcy court stated, "J.P. Morgan stipulated that it was not authorized to do business as is required [by] Ark. Code Ann. § 18-50-117."  Opinion & Order at at 6; *see also id.* at 2 and 8.  Similarly, the bankruptcy court stated that "J.P. Morgan stipulated that it was not in compliance with that provision [§ 18-50-117]."  *Id.* at 8.  Further, although the bankruptcy court recognized that the SFA provides "no explanation . . . regarding what action is required in order to be authorized to do business," the bankruptcy court determined it need not decide the issue "because J.P. Morgan stipulated that it was not so authorized."  *Id.* at 8 n.5.

However, the parties' stipulation was clearly limited to the fact that JP Morgan was not *registered* with any state official or entity.  JP Morgan never stipulated that it was not authorized to do business in Arkansas nor that it was not in compliance with § 18-50-117 of the SFA.  *See* Hr'g Tr. at 7:1-9.

After concluding that JP Morgan was not in compliance with the SFA based upon its erroneous understanding of the parties' stipulation, the bankruptcy court proceeded to determine whether JP Morgan could nevertheless employ the SFA's non-judicial foreclosure provisions.  First, the bankruptcy court examined whether the use of an attorney-in-fact licensed and located in Arkansas would allow JP Morgan to proceed with non-judicial foreclosures under § 18-50-102(a)(1).  *Id.* at 9-11.  Second, the bankruptcy court determined whether Arkansas' Wingo Act, Ark. Code Ann. §§ 4-27-1501 *et seq.*, a subset of the Arkansas Business Corporation Act, Ark. Code Ann. § 4-27-101 *et seq.* ("BCA"), which requires a "foreign corporation" to obtain a certificate of authority from the Arkansas Secretary of State before it may "transact business" in the state, exempted JP Morgan from compliance with the authorized-to-do-business requirement in the SFA.  *Id.* at 11-15.  Third, the bankruptcy court assessed whether the SFA is preempted by

8

the National Bank Act, 12 U.S.C. §§ 1 *et seq.* ("NBA"), and related regulations promulgated by

the Office of the Comptroller of the Currency ("OCC"), 12 C.F.R. §§ 1 *et seq.  Id.* at 15-21.  The

court resolved all three issues against JP Morgan.  Finally, the bankruptcy court awarded the

Debtors their attorneys' fees under Ark. Code Ann. § 16-22-308.

On October 12, 2011, JP Morgan filed its notice of appeal in each of the Debtors'

Bankruptcies.  Estes Dkt. No. 86; Johnson Dkt. No. 126; Peeks Dkt. No. 87.

## SUMMARY OF ARGUMENT

The bankruptcy court held that "J.P. Morgan was not in compliance with the authorized-

to-do-business requirement of the Statutory Foreclosure Act when it conducted the foreclosures

against" the Debtors.  Opinion & Order at 23.  The bankruptcy court also held, among other

things, that the authorized-to-do-business requirement of the Statutory Foreclosure Act was not

preempted by the NBA and regulations promulgated thereto.  However, the bankruptcy court's

decision is based upon the court's misunderstanding of the parties' stipulation and misapplication

of the controlling law.  Accordingly, the decision should be reversed.

*First*, the bankruptcy court's decision is predicated upon a clearly erroneous

understanding of the on-the-record stipulation.  Contrary to the bankruptcy court's misstatement,

JP Morgan never agreed that it is not authorized to do business in the state or that it is not in

compliance with SFA § 18-50-117; JP Morgan stipulated only that it was not registered with the

Arkansas Secretary of State or the Arkansas Bank Department.  As the bankruptcy court's

misunderstanding is clear error and as the court's determination that JP Morgan was not in

compliance with the SFA is based entirely upon the court's mischaracterization of the

stipulation, the decision must be reversed.

Second, there can be no doubt that, as a national bank organized under the laws of the

United States, JP Morgan is authorized to do business in Arkansas.  Thus, JP Morgan satisfies

the authorized-to-do-business requirement of the SFA.  Further, the plain language of the statute, legislative history and related Arkansas banking statutes firmly establish that JP Morgan may avail itself of the SFA.

Third, even if the SFA were interpreted to impose an additional authorization requirement upon national banks, the SFA would be preempted by the NBA.  The bankruptcy court failed to properly and fully apply the substantial authority regarding the preemptive effect of the federal statute and, thus, erroneously concluded that the SFA was not preempted.  The law is clear that state statutes that impose authorization or registration regimes upon national banks exercising their federally granted banking powers are both expressly and implicitly preempted.

Fourth, the SFA, if interpreted to require state registration, would violate the Commerce Clause of the United States Constitution.  The well-established law demonstrates that the SFA would be both *per se* discriminatory and impose a burden on interstate commerce that far outweighs any putative local benefits.

Fifth, the bankruptcy court overruled JP Morgan's objection to the Debtors' respective Chapter 13 plans based upon the Debtors' claims even though JP Morgan did not receive proper notice under the Bankruptcy Code and Rules of the basis for the Debtors' objections.

Finally, the bankruptcy court improperly awarded the Debtors statutory attorneys' fees in contravention of the provisions of the relevant statute.

Accordingly, the bankruptcy court's decision should be reversed in its entirety.

## ARGUMENT

**I.     As A National Bank, JP Morgan Is Authorized
        To Do Business Under SFA § 18-50-117**

The bankruptcy court's decision is predicated primarily, and dispositively, upon its misunderstanding of the parties' on-the-record stipulation.  Contrary to the bankruptcy court's

repeated statements, JP Morgan never stipulated that it was not authorized to do business in the

State of Arkansas, nor did JP Morgan stipulate that it was not in compliance with § 18-50-117 of

the SFA.  *Compare* Opinion & Order at 2, 6, 8 & n.5 *with* Hr'g Tr. at 7:1-9.[3]  As set forth below,

JP Morgan, as a national bank, is fully authorized to do business in the State of Arkansas and

under the SFA.  Accordingly, the bankruptcy court's decision must be reversed.

## A.    The Bankruptcy Court Misconstrued The Parties' Stipulation

According to the bankruptcy court's misunderstanding of the oral stipulation entered into

the record by Debtors' counsel during the consolidated hearing, "J.P. Morgan stipulated that it

was not authorized to do business as is required [by] Ark. Code Ann. § 18-50-117."  *Id.* at 6; *see*

*also id.* at 2, 8 n.5.  Further, the bankruptcy court stated that "§ 18-50-117 of the Statutory

Foreclosure Act requires an entity to be authorized to do business in Arkansas, and J.P. Morgan

stipulated that it was not in compliance with that provision."  *Id.* at 8.  Thus, solely on the basis

of the purported stipulation, the court concluded that "J.P. Morgan was not in compliance with

the authorized-to-do-business requirement of the Statutory Foreclosure Act when it conducted

the foreclosures against these Debtors. . . .  As a result, the foreclosure fees and costs incurred . .

. are not owed."  *Id.* at 23.

However, the hearing transcript makes clear that JP Morgan stipulated only that it "is not

a national bank <u>registered</u> with the Secretary of State as an entity to conduct business in

Arkansas and is not <u>registered</u> as an out of state bank doing business in Arkansas with the

Arkansas Bank Department."  Hr'g Tr. at 7:1-12 (emphasis added).  JP Morgan did not stipulate

that it was not authorized to do business in Arkansas, nor that it was not in compliance with the

---

[3] The bankruptcy court also assumed, without deciding, and without referring to any basis in the SFA, that obtaining authority to do business for purposes of § 18-50-117 was synonymous with registering under wholly separate Arkansas statutes.  Opinion & Order at 8 n.5.

SFA; only that it had not registered with Arkansas officials. The bankruptcy court misconstrued the stipulation and ruled against JP Morgan based upon the court's mistake. *See* Opinion & Order at 2, 6, 8 & n.5, 23.

This Court need not give any weight to the bankruptcy court's misapprehension of the parties' agreement or misreading of the record. *See, e.g.*, *Robinson*, 608 F.3d at 381 ("[T]he court ruled that the issue was already resolved as a matter of stipulated fact. This was clear error, because [defendant] made no such stipulation."); *Springfield Television, Inc. v. City of Springfield, Mo.*, 462 F.2d 21, 23 (8th Cir. 1972) (finding that the district court's ruling "misconstrue[d] the effect of the stipulation"); *Vuitton et Fils, S.A. v. J. Young Enterprises, Inc.*, 609 F.2d 1335, 1338 (9th Cir. 1979) (reversing district court decision where the lower court did not "properly interpret the stipulation between" the parties).

## B.    JP Morgan Is Authorized To Do Business In Arkansas

It is undisputed that JP Morgan is a national bank chartered by the OCC pursuant to the NBA. *See* Hr'g Tr. at 16:15-25; *Excelsior Funds, Inc. v. JP Morgan Chase Bank, N.A.*, 470 F. Supp. 2d 312, 313 (S.D.N.Y. 2006) (describing JP Morgan as "a national banking association"); *New Mexico ex rel. Foy v. Vanderbilt Cap. Advisors, LLC*, No. CIV 09-0178, 2009 WL 3672921, at *3 (D.N.M. Apr. 13, 2009) (describing "JP Morgan Chase Bank, N.A., [as] a federally chartered national bank organized under the laws of the United States").[4]  As such, JP Morgan is authorized to conduct banking activities throughout the United States.

---

[4] Additionally, the Court may take judicial notice of JP Morgan's status as a national bank where, as here, the bank's name includes the words "National Association" and JP Morgan's status, as listed on the OCC website, is a matter of public record. *See OCC: Licensing: National Banks and Thrift Savings Associations*, www.occ.treas.gov/topics/licensing/ national-bank-lists/index-national-bank-lists.html (last visited Jan. 11, 2012); *see also In re Hollingworth*, 453 B.R. 32, 35 (Bankr. D. Mass. 2011) (Courts "may take judicial notice that a bank is a national bank if the bank is described by name as a 'national' bank.") (collecting cases); *cf. Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001) (courts may take

Enacted in 1864 to establish a national banking system, the NBA "vested in nationally chartered banks enumerated powers and 'all such incidental powers as shall be necessary to carry on the business of banking.'" *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) (quoting 12 U.S.C. § 24 Seventh); *see First Nat'l Bank of E. Arkansas v. Taylor*, 907 F.2d 775, 777 (8th Cir. 1990) ("In addition to enumerating specific powers, including the lending of money, the National Bank Act grants national banks the power to exercise 'all such incidental powers as shall be necessary to carry on the business of banking.'") (quoting 12 U.S.C. § 24 Seventh); *see also NationsBank of N. Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995) (quoting 12 U.S.C. § 24 Seventh) (same).

National banks require OCC authorization and are subject to both OCC oversight and OCC regulations promulgated pursuant to the NBA. *See Watters*, 550 U.S. at 6; *see also* 12 U.S.C. § 481 ("The Comptroller of the Currency, with the approval of the Secretary of the Treasury, shall appoint examiners who shall examine every national bank as often as the Comptroller of the Currency shall deem necessary."); *see also Sinclair v. Hawke*, 314 F.3d 934, 940-41 (8th Cir. 2003) ("Today, the OCC's extensive oversight powers include approving applications for new national bank charters, for the grant of additional corporate powers, and for changes in the ownership of existing banks; issuing cease and desist orders and prompt corrective action notices to curb unsafe and unsound banking practices; [and] assessing civil money penalties . . . ."); 12 U.S.C. § 26 (giving authorization power to OCC and listing banking requirements); *id.* § 27 (upon determination of compliance, OCC issues a certificate stating that the national bank is "authorized to commence" banking business); 12 C.F.R. §§ 5.4, 5.5, 5.20

---

judicial notice of matters in the public record); *Kaggen v. I.R.S.*, 71 F.3d 1018, 1021 (2d Cir. 1995) (same).

13

(setting filing and licensing requirements, including application, requirements, considerations, review, approval and filing fee).

The power conferred by the NBA applies "in the several States, the District of Columbia, the several Territories and possessions of the United States, and the Commonwealth of Puerto Rico."  12 U.S.C. § 42.  In other words, there can be no doubt that the NBA grants a national bank, like JP Morgan, the authority to conduct banking activities in every state.  *See*, *e.g.*, *Tiffany v. Nat'l Bank of Missouri*, 85 U.S. 409, 412, 21 L. Ed. 862 (1873) ("It cannot be doubted, in view of the purpose of Congress in providing for the organization of National banking associations, that it was intended to give them a firm footing in the different States where they might be located."); *Cox v. ReconTrust Co., N.A.*, No. 10-CV-492 CW, 2011 WL 835893, at *2 (D. Utah Mar. 3, 2011) (affirming, on motion for reconsideration, that the NBA constitutes "authorization by Congress for a national bank to commence business in any state, free from any additional state requirements to do so"); *Bank of Am., Nat'l Trust & Sav. Ass'n v. Lima*, 103 F. Supp. 916, 917-18 (D. Mass. 1952) ("The bank in question is a national bank and an instrument of the national government.  Its presence in the state is attributable to the national power, not to the state's permission.").

Congress has expressly authorized national banks to engage in real estate lending, including the power to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate, subject to . . . such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order."  12 U.S.C. § 371; *see also* 12 C.F.R. § 34.4 (confirming that "a national bank may make real estate loans under 12 U.S.C. § 371 and [12 C.F.R.] § 34.3, without regard to state law limitations concerning[] . . . [p]rocessing, origination, servicing, sale or purchase of, or investment or participation in,

14

mortgages"); *Watters*, 550 U.S. at 7 ("The NBA specifically authorizes federally chartered banks to engage in real estate lending.").

The express power to make real estate loans necessarily includes the incidental authority to conduct foreclosures when the borrower defaults on the loan. *See, e.g.*, OCC Interpretive Letter No. 646, CCH Fed. Banking L. Rep. ¶ 83,555, 1994 WL 568014 (Apr. 12, 1994) ("Collection and servicing of evidences of debt owned by others has long been a part of the banking business" and "[l]ending includes not only the initial extension of credit but also collecting payments [and] foreclosing on collateral if the debtor defaults."); *see also Miller v. King*, 223 U.S. 505, 510 (1912) (observing that a national bank "may do those acts and occupy those relations which are usual or necessary in making collections of commercial paper and other evidences of debt"); Opinion & Order at 20 ("[T]he bank's ability to conduct its business of banking[ ] includes its rights to hold and enforce mortgage liens.").

Indeed, a national bank's express power to engage in real estate lending would be of little worth if such power did not include the incidental authority to foreclose when necessary. A national bank's incidental powers "are not limited to activities that are deemed essential to the exercise of express powers." *Taylor*, 907 F.2d at 778. "Rather, courts have analyzed the issue by asking whether the activity is closely related to an express power and is useful in carrying out the business of banking." *Id.*; *see Arnold Tours, Inc. v. Camp*, 472 F.2d 427, 432 (1st Cir. 1972) (observing that "a national bank's activity is authorized as an incidental power, 'necessary to carry on the business of banking,' within the meaning of 12 U.S.C. § 24, Seventh, if it is convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act"). Clearly, foreclosure is closely related to real estate lending and is both useful and convenient when banks exercise that express power.

15

Determination of whether an activity is authorized as an incidental power should not be unnecessarily constrained.  As the Supreme Court explained in *Franklin Nat'l Bank v. New York*, 347 U.S. 373, 377 (1954), where the Court found that even advertising was an incidental power necessary to carry on the business of banking, "[w]e cannot believe that the incidental powers granted to national banks should be construed so narrowly as to preclude the use of advertising in any branch of their authorized business."  The reasoning of the Supreme Court applies with greater force here; the incidental powers granted a national bank should not be construed so narrowly as to exclude foreclosure on mortgages secured through the exercise of the express power to engage in real estate lending.  In light of other powers that courts have found to be incidental to the business of banking, foreclosing on property that secures a real estate loan certainly qualifies as an incidental power.  *See  Taylor*, 907 F.2d at 778 (collecting cases finding that operating a safe-deposit business, selling mortgage pass-through certificates, selling municipal bond insurance and leasing property were incidental powers); *see also Bank One, Utah v. Guttau*, 190 F.3d 844, 850 (8th Cir. 1999) (concluding, based upon *Franklin Nat'l Bank*, that advertising on ATMs was an incidental power).

Accordingly, because it is a chartered national bank, JP Morgan is authorized by the laws of the United States to conduct business, including foreclosures, in every state.  JP Morgan is therefore in conformity with the SFA and may avail itself of the non-judicial foreclosure process without additional state authorization.

### C.   Use Of The SFA Requires Only That JP Morgan Be Authorized To Do Business In Arkansas

Given JP Morgan's national bank status and the OCC's authorization to conduct, nationwide, the business of banking, including real estate lending and foreclosure, the bankruptcy court erred by concluding that JP Morgan was not authorized under § 18-50-117 of

16

the SFA.  Contrary to the Debtors' claim, the SFA does not contain a requirement that an otherwise qualified bank must register with the state or obtain a certificate of authority.  The plain language of the statute and its legislative history, as well as a review of other banking statutes, demonstrate that no such registration is required.

### 1.  The Plain Meaning Of The SFA Is Clear

The plain language of the provision setting forth the requirement for use of the SFA mandates only that, to avail itself of the statutory framework, an entity such as JP Morgan must be "authorized to do business in this state."  *See* Ark. Code Ann. § 18-50-117.  A requirement that a bank register with a state official or entity before availing itself of the provisions of the SFA appears nowhere in the statute or its legislative history.

"The basic rule of statutory construction is to give effect to the intent of the General Assembly.  In determining the meaning of a statute, the first rule is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language."  *Mamo Transp., Inc. v. Williams*, 289 S.W.3d 79, 83 (Ark. 2008).  "If the language of a statute is clear and unambiguous, and conveys a clear and definite meaning, there is no occasion for resorting to rules of statutory interpretation."  *Ramirez v. White*, 38 S.W.3d 298, 301 (Ark. 2001).  If no ambiguity exists, "[t]he plain-meaning rule is applied first."  *Id.*; *see Henson v. Fleet Mortg. Co.*, 892 S.W.2d 250, 252 (Ark. 1995) ("The first rule in considering the meaning of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language.").

Section 18-50-117 of the SFA states that "[n]o person, firm, company, association, fiduciary, or partnership, either domestic or foreign, shall avail themselves of the procedures under this chapter unless authorized to do business in this state."  Ark. Code Ann. § 18-50-117.

Section 18-50-116 further limits the use of the SFA to a "mortgage company as defined in § 18-50-101 or . . . a bank or savings and loan."   Ark. Code Ann. § 18-50-116(c).

There is nothing ambiguous about this language.  Reading sections 18-50-116(c) and 18-50-117 together, the plain language of the statute dictates that only mortgage companies, banks or savings and loan companies that are "authorized do to business" in Arkansas may avail themselves of the state's non-judicial foreclosure process.  That language must be strictly construed.  *See Henson*, 892 S.W.2d at 253 ("Any statute which is in derogation of or at variance with the common law must be strictly construed."); *Simmons First Bank of Arkansas v. Bob Callahan Servs., Inc.*, 13 S.W.3d 570, 573 (Ark. 2000) ("Strict construction means narrow construction and requires that nothing be taken as intended that is not clearly expressed."). There are no additional requirements and, specifically, there is no requirement of registration with Arkansas officials such as the Secretary of State.

As national banks such as JP Morgan are authorized to conduct banking activities in all states, JP Morgan is in compliance with the SFA and may avail itself of the non-judicial foreclosure process.  There is no reason to look beyond the plain language of the statute.

### 2.     The SFA Does Not Require A Certificate Of Authority

As set forth above, and as the bankruptcy court recognized, the SFA contains no registration requirement nor any additional requirements beyond authorization.  *See* Opinion & Order at 8 n.5.  Nevertheless, in dicta, the bankruptcy court erroneously stated, with little analysis and without making an ultimate determination, that "[f]ollowing a review of other provisions within the Arkansas code, it appears that this [authorization] requirement generally demands that a party obtain a certificate of authority from the secretary of state."  Opinion & Order at 8 n.5.  The bankruptcy court relied upon two Arkansas statutes:  the Wingo Act, Ark. Code Ann. §§ 4-27-1501 *et seq.*, and the Interstate Banking and Branching Act ("Branching

Act"), Ark. Code Ann. §§ 23-48-1003 *et seq.*  However, neither statute supports the notion that the SFA requires registration with any Arkansas official or entity and the bankruptcy court's incomplete analysis should be given little weight.

The Wingo Act, a sub-section of the Arkansas Business Corporation Act ("BCA"), §§ 4-27-101 *et seq.*, which requires a "foreign corporation" to obtain a certificate of authority from the Arkansas Secretary of State, Ark. Code Ann. § 4-27-1501, does not apply to national banks.  As discussed more fully below, the powers of national banks stem from a grant of federal authority, to the exclusion of any state licensing regime.  Consequently, the Wingo Act is preempted.  *See Steward v. Atl. Nat'l Bank of Boston*, 27 F.2d 224, 228 (9th Cir. 1928) (observing that a "national bank is not a foreign corporation within the terms of the constitutional and statutory provisions of" an Arizona statute regulating foreign corporations); *Cox v. ReconTrust Co., N.A.*, No. 10-CV-492, 2010 WL 2519716, at *7 (D. Utah June 11, 2010) ("[N]umerous federal and state court decisions [] have unanimously concluded that state law registration requirements for foreign corporations are preempted as to national banks.") (collecting cases); *Lima*, 103 F. Supp. at 917-18 ("The bank in question is a national bank and an instrument of the national government.  Its presence in the state is attributable to the national power, not to the state's permission.").  Accordingly, the bankruptcy court's reliance on that statute is misplaced.

The court's reliance upon the Branching Act is similarly unfounded.  As discussed in greater detail below, the Branching Act is premised upon Congress' specific grant of authority to the states to regulate bank branches, and requires a bank to obtain a certificate of authority only when "[a]n out-of-state bank . . . desires to operate a branch location in the State of Arkansas . . . ."  Ark. Code Ann. § 23-48-1001(a) (emphasis added).  JP Morgan does not operate any branch locations in Arkansas and the bankruptcy court's use of the Branching Act to support the proposition that JP Morgan must obtain a certificate of authority is simply incorrect.

Thus, although the bankruptcy court did not actually make a determination regarding the necessity to register, the bankruptcy court's limited treatment of the issue fails for the reasons above.

### 3.   Legislative History And Related Statutes Confirm The Plain Meaning

As discussed above, the SFA unambiguously requires only authorization to do business, and does not impose additional registration requirements.  Although not necessary in light of the statute's plain meaning, a review of the SFA's legislative history and other Arkansas banking statutes supports this conclusion.  In conducting such an inquiry, Arkansas courts will "interpret [the statute] according to the legislative intent, and [the] review becomes an examination of the whole act.  [The Court will] reconcile provisions to make them consistent, harmonious, and sensible in an effort to give effect to every part."  *DaimlerChrysler Corp. v. Smelser*, 289 S.W.3d 466, 472 (Ark. 2008) (internal citations omitted);  *see also Wal-Mart Stores, Inc. v. D.A.N. Joint Venture III, L.P.*, 288 S.W.3d 627, 629 (Ark. 2008) ("If there is an ambiguity, the court looks to the legislative history of the statute and other factors, such as the language used and the subject matter involved.  The court strives to reconcile statutory provisions relating to the same subject to make them sensible, consistent, and harmonious.").

#### a.   2003 Amendments Demonstrate Legislative Intent To Include National Banks Among Those Authorized Under § 18-50-117

Evidence of the legislative intent behind the SFA is limited.  However, the bill that enacted § 18-50-117 in 2003 clearly demonstrates that the Arkansas General Assembly intended that the term "authorized to do business" means no more than that, and includes national banks authorized by the NBA.  *See* Ark. Acts of 2003, No. 1303, § 3 ("2003 Amendment").  When it enacted § 18-50-117, the General Assembly included an "Emergency Clause" describing the purpose of the provision, finding that

> foreign entities not <u>authorized to do business</u> in the State of Arkansas are availing
> themselves to the provisions of the Statutory Foreclosure Act of 1987; that often
> times it is to the detriment of Arkansas citizens; and that this act is immediately
> necessary because these entities <u>should be authorized to do business</u> in the State
> of Arkansas before being able to use the Statutory Foreclosure Act . . . .

2003 Amendment (emphasis added).  The General Assembly twice used the term "authorized," and nothing more.  Had it wished to require additional qualifications, the legislature surely would have used words indicating as such, stating, for example, that foreign entities had to be "registered" or "certified" before conducting non-judicial foreclosures, or that foreign entities had to be authorized "under the laws of Arkansas."  It did not, and this legislative choice must be given full effect.  *See, e.g.*, *Bullion v. Aetna Ins. Co.*, 237 S.W. 716, 718 (Ark. 1922) ("In passing upon this question we conceive it to be our duty only to ascertain the legislative intent, and this must be done by interpreting the words which the Legislature itself has employed in expressing that intent."); *State v. Trulock*, 160 S.W. 516, 517 (Ark. 1913) ("The cardinal rule of interpretation is the ascertainment of the meaning of the lawmakers as expressed in the language which they have used.").

Moreover, in the same legislation that added § 18-50-117, the General Assembly also amended § 18-50-102, the section of the SFA that sets forth who may be a party to a non-judicial foreclosure proceeding.[5]  Notably, however, the legislature left untouched the provision of § 18-50-102(a) providing that a qualified trustee under Arkansas statutory foreclosure law included a "[b]ank or savings and loan association authorized to do business <u>under the laws of Arkansas or those of the United States</u>."  *See* 2003 Amendment (emphasis added).  Thus, the General Assembly manifested its intent to continue to allow a trustee "authorized to do business under the laws of Arkansas or those of the United States" to conduct non-judicial foreclosures.  *Id.*

---

[5] Section 18-50-102 clearly refers to those parties who may actually conduct the non-judicial foreclosure process, as opposed to § 18-50-117, which defines who may "avail" themselves of the provisions of the SFA.

It would make no sense, therefore, for the legislature to intend § 18-50-117 to limit banks authorized to utilize the SFA to only to those who had registered with the state but to not also alter the language in § 18-50-102 accordingly.  Indeed, had the legislature intended § 18-50-117 to require anything more than "authorization" by virtue of a national bank's charter under federal law, the language of § 18-50-102 would be rendered meaningless because a "[b]ank or savings and loan association authorized to do business under . . . the laws of the United States" could not avail itself of the provisions of the SFA, and thus could not be a trustee.  2003 Amendment (emphasis added).

Additionally, had the legislature wished to impose a registration requirement on national banks, the legislature could have borrowed language from § 18-50-102 and drafted § 18-50-117 to include the limiting language "under the laws of Arkansas."  The fact that the legislature chose not to do so further demonstrates its intent to allow any authorized bank – whether authorized by virtue of its national charter or by registration with Arkansas regulatory bodies – to conduct non-judicial foreclosures so long as the other provisions of the SFA are satisfied.

### b.  2011 Amendments To The SFA Affirm The Legislature's Intent

In 2011, § 18-50-102 was again amended to redefine those who can be parties to non-judicial foreclosures, and in so doing the legislature confirmed that national banks may conduct statutory foreclosures without any requirement of registration.  Ark. Acts of 2011, No. 901, § 2.

Section 18-50-102 was amended to include additional requirements for entities that wish to be parties to a foreclosure.  Principal among the new prerequisites is that a "state-chartered bank" or "nationally chartered bank" must have "a physical business location open for business for normal banking hours located within the State of Arkansas."  Ark. Code Ann. § 18-50-102(a)(2).  Nowhere in the amendment to § 18-50-102(a)(2) does the Arkansas legislature

require that a national bank be registered with the state or obtain a certificate of authority before conducting non-judicial foreclosures.  Thus, although the 2011 amendment imposed additional conditions on national banks interested in being a party to foreclosure, those conditions did not include a registration requirement.

It is important to note that a national bank may have a physical location in Arkansas without first becoming registered with state officials.  For example, national banks are explicitly authorized by the OCC to establish loan production offices nationwide without regard to state law.  *See* 12 C.F.R. § 7.1004; *see also* 12 C.F.R. § 25.12 (defining a loan production office as "a staffed facility, other than a branch, that is open to the public and that provides lending-related services, such as loan information and applications").  Because loan production offices are not "branches," a bank need not obtain a certificate of authority from the State of Arkansas, as it would if it desired to open a branch.  *See* Ark. Code Ann. § 23-48-1001.

The language carefully chosen by the legislature to define entities authorized to foreclose is precise and must be presumed to be intentional.  Once again, had the legislature intended to include a registration requirement, it clearly could have done so, but did not.  Similarly, had the legislature wished to include in the SFA the same registration requirement associated with establishing a branch, it certainly could have done so by simply utilizing the term "branch" rather than "physical location."

In sum, both the 2003 and 2011 amendments to the SFA demonstrate the Arkansas legislature's recognition that national banks are fully authorized to do business in Arkansas and entitled to avail themselves of the SFA without further qualification.

c.      **Other Arkansas Statutes Confirm The Legislative Intent**

The legislature's recognition that national banks are authorized to conduct business in Arkansas without the requirement of registration is confirmed by other Arkansas statutes

involving banking activity.  These statutes include the Arkansas Banking Code, Ark. Code Ann.

§§ 23-45-101 *et seq.*, and the Branching Act.

### (i)      The Arkansas Banking Code

The "Definitions" provision of the Arkansas Banking Code supports the proposition that

national banks are authorized to conduct business in Arkansas without additional state imposed

requirements.  Specifically, § 23-45-102(a)(5)(A) defines a "Bank" as "a state bank <u>or a national</u>

<u>bank</u> or an out-of-state state-chartered bank that has received a certificate of authority under

§ 23-48-1001." (emphasis added).[6]  This definition reflects a clear understanding by the

Arkansas legislature that national banks are authorized to conduct banking business in Arkansas

without qualification.[7]

Further, the section of the Banking Code setting forth the powers and duties of the State

Bank Commissioner, known as the Wild Card Statute, grants the Bank Commissioner the power

to "[a]uthorize state banks to engage in any banking activity <u>in which national banks are</u>

<u>authorized or may hereafter be authorized by federal legislation or regulations to engage</u>."  Ark.

Code Ann. § 23-46-205(d)(8) (emphasis added).

Pursuant to the Wild Card Statute, the State Bank Commissioner and the State Banking

Board have issued numerous resolutions and orders that grant state banks the same powers as

those conferred upon national banks by the NBA.  For example, in 1984, recognizing that

national banks were authorized to establish loan production offices, the State Banking Board

---

[6] As discussed below, § 23-48-1001, part of the Branching Act, makes clear that an out-of-state bank is only required to obtain a certificate of authority if it wishes to open a branch in the state.

[7] Additionally, § 23-48-701 specifically defines the "supervisory banking authority" for national banks as "the United States Comptroller of the Currency," reflecting yet another legislative acknowledgment that national banks' authority derives from the laws of the United States, not from Arkansas law or Arkansas regulatory bodies.

passed a resolution allowing state banks to do the same, "in order to maintain state chartered banks on [the] basis of competitive equality with national banks . . . ."[8]  *See* Resolution of the State Banking Board, dated Oct. 16, 1984 (emphasis added).  Additionally, the Bank Commissioner has permitted Arkansas state banks to conduct activities through a "'financial subsidiary' in the same manner and with the same requirements as those provided for national banks by the [OCC]," Policy Statement, Order of the State Bank Commissioner, dated May 3, 2000, Ark. Admin. Code 210.00.13 (emphasis added), and to "buy and sell securities for its customers and others in the manner in which a national bank is authorized to do the same," Resolution of the State Banking Board, dated Mar. 8, 1983 (emphasis added).[9]

The Wild Card Statute, together with the resolutions and orders issued by Arkansas banking authorities, reflect an unequivocal acknowledgment by the Arkansas legislature and regulators that national banks are authorized to do business in Arkansas pursuant to federal law.

### (ii)    The Branching Act

The fact that national banks need not register with the state in order to be "authorized to do business" in Arkansas is further confirmed by the Branching Act.  Congress has explicitly granted states the authority to regulate bank branches, including branches of national banks.  *See Watters*, 550 U.S. at 15  ("Congress expressly authorized national banks to establish branches 'only when, where, and how state law would authorize a state bank to establish and operate such

---

[8] Although, as discussed below, Congress has specifically granted the states the authority to regulate bank branches, the OCC "has long taken the position that loan production offices are not branches and are not subject to geographic restrictions."  *See* OCC Interpretive Letter No. 721, CCH Fed. Banking L. Rep. ¶ 81,036, 1996 WL 306098 (Mar. 6, 1996).

[9] The resolutions and orders of the Bank Commissioner and State Banking Board are public records of a regulatory agency of which the Court may take judicial notice. *See, e.g.*, *Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 545 F. Supp. 2d 845, 847 (E.D. Ark. 2008) (taking judicial notice of SEC releases).

[branches].'") (brackets in original) (quoting *First Nat'l Bank in Plant City, Fla. v. Dickinson*, 396 U.S. 122, 130 (1969)).  Consistent with that authority, the Arkansas Branching Act mandates that "[a]n out-of-state bank that desires to operate a branch location in the State of Arkansas . . . shall apply for a certificate of authority to transact banking business in this state."  Ark. Code Ann. § 23-48-1001.

The language of the Branching Act demonstrates that when the legislature intends to require an out-of-state bank to register in order to perform activities within the state, it does so explicitly.  Had the legislature intended to impose a similar registration requirement in the SFA, the legislature would have included an equivalent provision.[10]

Moreover, as the Branching Act is the only Arkansas statute of which JP Morgan is currently aware that requires national banks to register with the state, it is apparent that the Arkansas legislature imposes such requirements on national banks only when specifically authorized to do so by federal law.

Taken together, these Arkansas statutes concerning the business of banking demonstrate not only that national banks are authorized to do business in the State of Arkansas, but also that national banks derive that authority from federal, not state, law.

### 4.     JP Morgan's Interpretation Of The SFA Is Consistent With The Legislature's Policy Goals

Reading the SFA to require no more than "authorization" to do business in Arkansas, which includes authorization conferred on national banks by the NBA, is entirely consistent with the public policy considerations behind § 18-50-117.  As discussed above, the enactment of § 18-50-117 by the Arkansas legislature arose out of a concern that "foreign entities not authorized to

---

[10] However, as demonstrated below, had the legislature included such language in the SFA, it would be preempted by the NBA.

do business in the State of Arkansas are availing themselves to the provisions of the [SFA]; [and] that often times it is to the detriment of Arkansas citizens . . . ." 2003 Amendment.

This provision, as the legislature indicated, is designed to prevent unauthorized banks, mortgage companies and savings and loans from conducting statutory foreclosures in Arkansas. Such entities would include, for example, an out-of-state mortgage company that has not received a certificate of authority from the Arkansas Secretary of State. Presumably, the General Assembly was concerned that unauthorized entities would lack supervision from a government body and would be able to evade accountability.

Here, however, such concerns are not implicated. As demonstrated above, national banks operate under the thorough and exhaustive supervision of the federal government and are subject to the various rules, regulations, restrictions and enforcement power of the OCC. Thus, the underlying purpose of the provision is met.

Additionally, national banks are subject to the jurisdiction of the Arkansas courts consistent with the Due Process clause and the Arkansas long-arm statute.[11] *See First Nat'l Bank of Lewisville, Ark. v. First Nat'l Bank of Clinton, Kentucky*, 258 F.3d 727, 728-729 (8th Cir. 2001) (examining whether a "federal court in Arkansas has personal jurisdiction over a Kentucky [national] bank" and concluding that "the Arkansas long-arm statue extends jurisdiction over nonresidents to the maximum extent permitted by the Due Process Clause"); *id.* at 729 (citing Ark. Code Ann. § 16-4-101).[12]

---

[11] In fact, JP Morgan currently is named as a defendant in multiple state and federal actions in Arkansas. *See, e.g.*, *supra* n.1.

[12] The provisions of § 18-50-102 provide additional protection. Section 18-50-102 limits the parties authorized to conduct non-judicial foreclosures to Arkansas attorneys with an office in the state, financial institutions with a physical location in the state or state agencies. *See* § 18-50-102(a).

Therefore, JP Morgan's interpretation of the SFA is consistent with the plain language of the Arkansas statute, the legislative history, and the public policy behind § 18-50-117. Accordingly, the bankruptcy court erred in its determination that JP Morgan was not authorized to avail itself of the SFA's non-judicial foreclosure process.

## II.    The National Bank Act Preempts The SFA's Authorization Requirement

In the event this Court finds that § 18-50-117 of the SFA requires JP Morgan to take any action beyond that mandated by the NBA in order to become "authorized to do business" in Arkansas, § 18-50-117 is preempted by the NBA.  Based upon an erroneous analysis of preemption jurisprudence, the bankruptcy court erred in concluding that the SFA was not preempted.

First, the bankruptcy court failed to recognize that the standard presumption against preemption does not apply in the context of national banking.  Second, the bankruptcy court failed to properly account for Congressional intent in assessing the preemptive effect of the NBA.  Third, the bankruptcy court ignored the provisions in the NBA and OCC regulations that expressly preempt a state's exercise of visitorial powers, including authorization, licensing and registration laws, where a national bank is exercising its real estate lending powers.  Finally, in its evaluation of whether the SFA's purported registration requirement stands as an obstacle to or interferes with the objectives of federal law, the bankruptcy court both misapplied and ignored substantial precedent.

As set forth below, a state requirement that a national bank obtain state approval or license to exercise a banking power authorized under federal law is an impermissible imposition of visitorial authority over a national bank.  *See, e.g.* Taylor, 907 F.2d at 780 ("[T]he National Bank Act precludes the Arkansas Commissioner [] from prohibiting [the national bank], either by direct coercion or through a license requirement, from" engaging in federally authorized

28

banking activity.)  Thus, the NBA both expressly and implicitly preempts the SFA's purported

authorization requirement, and, accordingly, the bankruptcy court's decision should be reversed.

A.      **Presumption Regarding Preemption And Congressional Intent Under The National Bank Act**

"The general law of preemption is grounded in the [United States] Constitution's

command that federal law 'shall be the supreme Law of the Land.'"  *In re Aurora Dairy Corp.*

*Organic Milk Marketing and Sales Practices Litig.*, 621 F.3d 781, 791 (8th Cir. 2010) (quoting

U.S. Const. art. VI, cl. 2).  "Two cornerstones" established by the Supreme Court guide the

analysis: the presumption regarding preemption and Congress' purpose in enacting the statute at

issue.  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

1.      **Presumption Regarding Preemption**

In the context of the NBA, the traditional presumption against preemption of state law

does not apply.   Where the states regulate "in an area where there has been a history of

significant federal presence," such as national banking, the normal presumption against

preemption associated with the states' historic police powers is not triggered.  *United States v.*

*Locke*, 529 U.S. 89, 108 (2000); *see Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 280

(6th Cir. 2009) ("In the context of national banking . . . the Supreme Court has held that the

general presumption against preemption does not apply.") (citing *Watters*, 550 U.S. at 12; *Locke*,

529 U.S. at 108; *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996));

*Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 314 (2d Cir. 2005) ("The presumption against

federal preemption disappears . . . in fields of regulation that have been substantially occupied by

federal authority for an extended period of time.  Regulation of federally chartered banks is one

such area."); *Bank of America v. City & Cnty. of San Francisco*, 309 F.3d 551, 558 (9th Cir.

2002) (although "states retain some power to regulate national banks[,] . . . because there has

29

been a history of significant federal presence in national banking, the presumption against preemption of state law is inapplicable") (internal quotations omitted).

Rather, the Supreme Court has made clear that Congressional "grants of both enumerated and incidental 'powers' to national banks [are] not normally limited by, but rather ordinarily pre-empt[], contrary state law." *Barnett*, 517 U.S. at 32; *see Watters*, 550 U.S. at 12 (quoting *Barnett*); *see also Guttau*, 190 F.3d at 848 (same). Thus, a state statute that "significantly impair[s] the exercise of authority, enumerated or incidental under the NBA, . . .  must give way." *Watters*, 550 U.S. at 11, 12. Put more simply, "'the States can exercise no control over [national banks], nor in any way affect their operation, except in so far as Congress may see proper to permit. Anything beyond this is an abuse, because it is the usurpation of power which a single State cannot give.'" *Id.* at 11-12 (brackets in original) (quoting *Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. 29, 34 (1875)).

Here, the bankruptcy court erred by embarking on its analysis with the presumption "that the historic police powers of the States" should not be preempted. Opinion & Order at 16. Accordingly, the bankruptcy court's assessment was premised upon an incorrect underlying assumption and the court's ultimate conclusion was similarly unsound.

## 2.   Congressional Intent

The bankruptcy court also erred because it failed to properly consider the Congressional intent behind the NBA. The Supreme Court has described the intent of Congress as the "ultimate touchstone" in assessing preemption. *Wyeth*, 555 U.S. at 565. As is evident by a brief review of the history and purpose of the NBA, Congress' incontrovertible intent in enacting the NBA was to create a national system of banking free from the ill-effects of duplicative and burdensome state regulation. *See Watters*, 550 U.S. at 10-11.

30

Pursuant to the NBA, Congress not only vested national banks with certain enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking," 12 U.S.C. § 24 Seventh, but also Congress provided that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law . . . ," *id.* § 484(a); *see* 12 C.F.R. § 7.4000 (listing examples of visitorial powers).[13]   Absent the NBA's protections, Congress feared that national banks would be subjected to numerous and inconsistent state regulations and face unequal competition from state banks.   As the Supreme Court explained:

> Diverse and duplicative superintendence of national banks' engagement in the business of banking, we observed over a century ago, is precisely what the NBA was designed to prevent: "Th[e] legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States."

*Watters*, 550 U.S. at 13-14 (quoting *Easton v. Iowa*, 188 U.S. 220, 229 (1903)); *see id.* at 11 (stating that 12 U.S.C. § 484's restriction on visitorial powers was meant "[t]o prevent inconsistent or intrusive state regulation from impairing the national system"); *see also First Nat'l Bank of Logan, Utah v. Walker Bank & Trust Co.*, 385 U.S. 252, 261 (1966) ("Congress intended to place national and state banks on a basis of 'competitive equality' . . . .").   Thus, the NBA "respond[ed] to the competitive tensions inherent in a dual banking structure . . . [and] reflects the congressional concern that neither system have advantages over the other." *Dickinson* at 131.

Critically, as the Supreme Court noted, "<u>it is a system that has never permitted States to license, inspect, and supervise national banks as they do state banks</u>." *Watters*, 550 U.S. at 15 n.7 (emphasis added); *see Cox*, 2010 WL 2519716, at *7 (concluding that 12 U.S.C. §§ 26, 27

---

[13] Enumerated visitorial powers include examination of a national bank, inspection of a national bank's books and records, regulation and supervision of activities authorized or permitted pursuant to federal banking law, and enforcing compliance with any applicable federal or state laws concerning those activities.  *See* 12 C.F.R. § 7.4000.

and 42 are "intended to be the exclusive authority on what a national bank must do to transact

business in any state" and dismissing claims on preemption grounds on reaffirmance, 2011 WL

835893); *see also Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S.

299, 308 (1978) ("[A] national bank . . . is an instrumentalit[y] of the Federal government,

created for a public purpose, and as such necessarily subject to the paramount authority of the

United States.") (internal quotations omitted); *Ass'n of Banks in Ins., Inc. v. Duryee*, 55 F. Supp.

2d 799, 803 (S.D. Ohio 1999), *aff'd* 270 F.3d 397 (6th Cir. 2000) (preempting state law requiring

national bank to register in order to transact business because it placed "impermissible conditions

upon the ability of a national bank to do business within the state"); *Taylor*, 907 F.2d at 778

("Because national banks are considered federal instrumentalities, . . . states may neither prohibit

nor unduly restrict their activities.") (internal citations omitted).

B.   **Express And Implied Preemption of SFA § 18-50-117**

Congress indicates preemptive intent in the express language of a statute and through the

statute's structure and purpose. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). The

courts recognize three types of preemption: express, field and conflict preemption. Express

preemption occurs where, as the name suggests, Congress uses "explicit preemptive language" to

express its purpose. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Field

preemption, which is inapplicable here, exists where the scheme of federal regulation is "so

pervasive as to make reasonable the inference that Congress left no room for the States to

supplement it." *Id.* (internal quotations omitted).[14] Conflict preemption, also known as obstacle

preemption, exists either where complying with the federal and state statutes "'is a physical

_____

[14] *See, e.g., Cuomo v. Clearing House Ass'n, LLC*, --- U.S. ----, 129 S. Ct. 2710, 2717-18 (2009) ("No one denies that the National Bank Act leaves in place some state substantive laws affecting banks."); *Watters*, 550 U.S. at 11 ("Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA.").

impossibility,'" *id.* (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963)), or where state law "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

The bankruptcy court clearly erred in concluding both that express preemption and conflict or obstacle preemption did not apply.  The NBA authorizes national banks "to conduct its business of banking, which includes its rights to hold and enforce mortgage liens," Opinion & Order at 20, in every state without the need to comply with varied state registration and licensing laws that would otherwise impose competitive barriers or infringe on the national banks' ability to exercise their banking powers.  *See also* OCC Interpretive Letter No. 646; *Miller*, 223 U.S. at 510.  The SFA, if interpreted to impose additional authorization requirements, as the bankruptcy court suggests, would subject national banks to duplicative and unduly burdensome regulatory requirements, thus curtailing federally granted power and putting national banks at a competitive disadvantage relative to their state bank counterparts.

Thus, it is clear that the NBA preempts § 18-50-117 of the SFA based upon not only the express language of the NBA and its related regulations, but also the uniform case law establishing that state authorization requirements cannot apply to national banks.[15]  *See, e.g.*, *Watters*, *Barnett*, *Cox*, *Guttau*, *Taylor*.

**1.    The National Bank Act Expressly Preempts
Arkansas' State Law Requiring Authorization**

Where Congress uses "explicit preemptive language" to express its purpose, a contrary state statute will be preempted.  *Gade*, 505 U.S. at 98.  The bankruptcy court erroneously stated that "express preemption does not apply."  Opinion & Order at 18.  Although the bankruptcy

---

[15] The NBA's preemption protections apply equally to national banks, like JP Morgan, and any operating subsidiaries, like Chase.  *See Watters*, 550 U.S. at 7.

court correctly noted that no specific NBA provision preempts state non-judicial foreclosure laws, the court nevertheless erred in concluding that no NBA provisions expressly preempt "state laws requiring a person or entity to be authorized to do business in the state before employing the non-judicial foreclosure process." *Id.* In fact, the NBA and regulations promulgated by the OCC expressly preempt a state's exercise of visitorial powers, including authorization, licensing and registration laws, where a national bank is exercising its real estate lending powers.

As set forth above, national banks are governed by the NBA and the regulations promulgated by the OCC.[16] *See supra* Part I.B.  The NBA provisions and OCC regulations establish authorization requirements and procedures that all national banks must satisfy.  *See supra* Part I.B.  The NBA also expressly authorizes national banks to engage in real estate lending.  *See supra* Part I.B; 12 U.S.C. § 371; OCC Interpretive Letter No. 646; *Watters*, 550 U.S. at 6 ("Security against significant interference by state regulators is a characteristic condition of 'the business of banking' conducted by national banks, and <u>mortgage lending is one aspect of that business</u>.") (internal quotations omitted) (emphasis added).

As also set forth above, Congress has made clear that "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law . . ." when exercising federally granted banking powers.  12 U.S.C. § 484(a); *see* 12 C.F.R. § 7.4000.  "In particular, real estate lending, when conducted by a national bank, is immune from state visitorial control:  The NBA

---

[16] It is well settled that the OCC's regulations have no less preemptive effect than the NBA's statutory provisions.  *See, e.g.*, 12 U.S.C. § 93a (authorizing OCC "to prescribe rules and regulations to carry out the responsibilities of the office"); *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010) (citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)); *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 899 (2000); *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).  It is equally well settled that the OCC's interpretation of the NBA and the regulations promulgated thereto are entitled to "great weight."  *Bank One, Utah v. Guttau*, 190 F.3d 844, 849 (8th Cir. 1999) (citing *Taylor*, 907 F.2d at 777 (in turn citing *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403 (1987))); *see Norwest Bank Minnesota, Nat'l Ass'n v. Sween Corp.*, 118 F.3d 1255, 1259 (8th Cir. 1997); *see also* Opinion & Order at 18 n.9.

specifically vests exclusive authority to examine and inspect in OCC." *Watters*, 550 U.S. at 2 (citing 12 U.S.C. § 484(a)); *see Cox*, 2010 WL 2519716, at *7.

In accordance with the NBA, OCC regulations provide that "[s]tate officials may not exercise visitorial powers with respect to national banks," including, among others, the "regulation and supervision of activities authorized or permitted pursuant to federal banking law." 12 C.F.R. §§ 7.4000(a)(1), (a)(2)(iii); *see id.* §§ 5.4, 5.5, 5.20; *see also* 12 U.S.C. §§ 26, 27, 42, 93a. Further, the OCC has promulgated regulations that state: "Specifically, a national bank may make real estate loans under 12 U.S.C. §§ 371 and 34.3, without regard to state law limitations concerning: (1) Licensing, registration (except for purposes of service of process), filings, or reports by creditors . . . ." 12 C.F.R. § 34.4(a)(1). As discussed above, the express power to make real estate loans necessarily includes the incidental power to foreclose on the loan in the event of default. *See supra* at 14-15.

Thus, to the extent SFA § 18-50-117 is interpreted to require JP Morgan to register or obtain certification beyond that mandated by the NBA and the OCC, it is expressly preempted. *See Watters*, 550 U.S. at 7 (holding that national banks and their operating subsidiaries are "subject to the OCC's superintendence, and not to the licensing, reporting, and visitorial regimes of the several States in which [the national bank or its subsidiaries] operate[]"); *see also Taylor*, 907 F.2d at 777 & n.6, 778 (Arkansas law requiring national bank to, among other things, obtain a license violated 12 U.S.C. § 484); *Norwest Bank*, 118 F.3d at 1259 (national bank not required to comply with Minnesota state law requiring a license for the collection of brokers' fees).[17]

---

[17] Section 34.4(a) of Title 12 in the C.F.R. is explicitly intended to be consistent with the preemption standards articulated by the Supreme Court in *Barnett* and *Watters*. Indeed, 12 U.S.C. § 25b(b)(1)(B), recently added to the NBA by the Dodd-Frank Act, employs the same "prevents or significantly interferes" language as *Watters* and *Barnett*. *See* Dodd-Frank Act, Pub. L. 111-203 (2010); 12 U.S.C. § 25b(b)(1)(B) (relying upon the preemption standard set in *Barnett*, 517 U.S. 25); *see also* Bank Activities and Operations; Real Estate Lending and

35

To hold otherwise would permit the State of Arkansas, not the federal government, to have final control over whether a national bank can exercise its real estate lending powers in the state and stand in direct contravention of the exhaustive reach and protective function of the NBA. *See Cox*, 2010 WL 2519716, at *7. Thus, the bankruptcy court erred in finding that express preemption did not apply here.[18]

### 2. The National Bank Act Implicitly Preempts SFA § 18-50-117

Pursuant to well-established principles of conflict or obstacle preemption, the structure and purpose of the NBA implicitly preempt the SFA's purported registration requirement. The bankruptcy court erred in its application of Supreme Court precedent, and accordingly, reached

---

Appraisals, 69 Fed. Reg. 1904-1, 1910 (Jan. 13, 2004) (citing *Hines*, 312 U.S. at 67, and *Barnett*, 517 U.S. at 33-34).

[18] While the Debtor may try to dilute the express language of 12 C.F.R. § 34.4(a)(1) by citing the non-visitorial right of states to regulate a national bank's "right to collect debts" in § 34.4(b)(5), that provision has no effect on the more specific – and express – prohibition against state laws related to licensing and registration. Any reliance upon § 34.4(b)(5) to nullify § 34.4(a)(1) would allow the exception to swallow the federal provisions explicitly preventing the states from exercising visitorial powers over national banks.

Moreover, case law relating to the "right to collect debts" predominantly concerns state fair debt collection statutes, which are considered statutes of general application. The SFA is neither a fair debt collection statute nor a statute of general application. *See Watters*, 550 U.S. at 13 (noting the "clear dichotomy between state laws that directly interfere with a national bank's 'efficient exercise' of enumerated and incidental powers bestowed upon it by the National Bank Act and those state laws that do not" and stating that "[t]he former are preempted, while the latter are not"); *see also Cuomo*, 129 S. Ct. 2710; *cf. Martinez*, 598 F.3d at 555 ("State laws of general application, which merely require all businesses (including national banks) to refrain from fraudulent, unfair, or illegal behavior, do not necessarily impair a bank's ability to exercise its real estate lending powers. Such laws are not designed to regulate real estate lending, nor do they have a disproportionate or other substantial effect on lending."); Ark. Code Ann. §§ 17-24-501 *et seq.* (the Arkansas Fair Debt Collection Practices Act).

Further, even if this Court were to find that the SFA is a law of general application, visitorial powers would still be reserved for the OCC. State laws governing a national bank's "right to collect debts" remain subject to the preemptive restriction that such laws "only incidentally affect" the national banks' real estate lending powers. 12 C.F.R. § 34.4(b). A state registration or licensing regime would have an established, non-incidental anti-competitive and discriminatory affect. *See infra* Part III.A.

the erroneous conclusion that such an authorization requirement did not significantly impair or burden a national bank's exercise of its banking powers.

"Where state law stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' it may be found to be preempted." *Guttau*, 190 F.3d at 848 (quoting *Barnett*, 517 U.S. at 116).  "Pre-emption in the area of national banks may occur even if compliance with both state and federal laws is possible where the state laws 'infringe [upon] the national banking laws or impose an undue burden on the performance of the banks' functions.'" *Duryee*, 55 F. Supp. 2d at 803 (quoting *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 248 (1944)).  More specifically, the Supreme Court has stated: "Beyond genuine dispute, state law may not significantly burden a national bank's own exercise of its real estate lending power, just as it may not curtail or hinder a national bank's efficient exercise of any other power, incidental or enumerated under the NBA." *Watters*, 550 U.S. at 13.

The courts have made clear that any attempt to impose registration or licensing requirements upon national banks is preempted precisely because it prevents and/or impairs the "efficient exercise" of powers bestowed by the NBA.  As the Supreme Court explained in *Watters*, "State laws that condition[] national banks' real estate lending on registration with the State, and subject[] such lending to the State's investigative and enforcement machinery would surely interfere with the banks' federally authorized business: National banks would be subject to registration, inspection, and enforcement regimes imposed not just by [one state], but by all States in which the banks operate." *Watters*, 550 U.S. at 13.

Similarly, as the Eighth Circuit found when addressing a claim that a Utah statute required a national bank's operating subsidiary to file an "application for authority" in order to transact business in the state, "[t]here is little question that by imposing additional burdens not found in federal law, these statutes 'significantly impair' a national bank's ability to do business

37

in Utah." *Cox*, 2010 WL 2519716, at \*6 (citing *Watters*, 550 U.S. at 12); *see also Watters*, 550

U.S. at 13 (parties conceded that Michigan statute requiring national bank to register and pay

fees before conducting banking activities would be preempted); *Taylor*, 907 F.2d at 777 & n.6,

778; *see also Nat'l City Bank of Indiana v. Turnbaugh*, 463 F.3d 325, 330, 332-33 (4th Cir.

2006) (Maryland law requiring license to act as a mortgage lender was preempted by NBA);

*Norwest Bank*, 118 F.3d at 1259; *Nat'l City Bank of Indiana v. Bakke*, No. 3-04-3914, 2005 WL

3544960, at \*1 (D.N.J. Dec. 22, 2005) (entering consent decree prohibiting New Jersey state

officials from exercising any licensing or regulatory authority over national bank); *see* OCC

Interpretive Letter. No. 957, 2003 WL 23221435 (Jan. 27, 2003) (state registration and fee

requirements imposed on mortgage lenders would be preempted); OCC Interpretive Letter No.

749, 1997 WL 268792 (Sept. 13, 1996) (state law requiring national banks to be licensed by the

state to sell annuities would be preempted).[19]

> Consistent with court precedent, the OCC has stated:
>
> When national banks are unable to operate under uniform, consistent, and
> predictable standards, their business suffers, which negatively affects their safety
> and soundness. The application of multiple, often unpredictable, different state or
> local restrictions and requirements prevents them from operating in the manner
> authorized under Federal law, is costly and burdensome, interferes with their
> ability to plan their business and manage their risks, and subjects them to
> uncertain liabilities and potential exposure. In some cases, this deters them from
> making certain products available in certain jurisdictions.

---

[19] Many state courts have also recognized that state registration laws cannot be applied to national banks and are preempted where they do so. *See, e.g.*, *770 PPR, LLC v. TJCV Land Trust*, 30 So. 3d 613, 615, 618 (Ct. App. Fl. 4th Dist. 2010); *Citibank v. Eckmeyer*, No. 2008-P-0069, 2009 WL 1452614, at \*4 (Ct. App. Ohio 2009); *In re Hibernia Nat'l Bank*, 21 S.W.3d 908, 910 (Ct. App. Tex. 2002); *Indiana Nat'l Bank v. Roberts*, 326 So. 2d 802, 803 (Sup. Ct. Miss. 1976); *State Nat'l Bank of Conn. v. Laura*, 45 Misc.2d 430, 431 (Cnty. Ct. Westchester Cnty. N.Y. 1965).

Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904-1 (Jan. 13, 2004) (relied upon in *Watters*, 550 U.S. at 13 n.6); *see Burke*, 414 F.3d at 320-21 (quoting same).  The OCC's pronouncement should not be disregarded.  *See supra* n.16.

The statutory and regulatory provisions detailed above establish that the OCC exercises exclusive control over authorization, registration, licensing and fee requirements imposed upon national banks to engage in the business of banking, including mortgage lending and foreclosure. The Supreme Court has clearly pronounced that the imposition of state regulation "over and above regulation undertaken by OCC" constitutes impermissible "duplicative state examination, supervision, and regulation [that] would significantly burden mortgage lending when engaged in by national banks."  *See Watters*, 550 U.S. at 17-18.  Numerous federal and state courts have found that state law registration requirements are preempted when applied to national banks.  *See Cox*, 2010 WL 2519716, at *7  Thus, Arkansas is preempted from establishing a competing state requirement that prevents national banks like JP Morgan from exercising banking powers without first receiving authorization from Arkansas officials.  Accordingly, the SFA is preempted.

Further, if § 18-50-117 of the SFA were interpreted to necessitate registration or obtaining a certificate of authority pursuant to the Wingo Act or the BCA, there can be little doubt that the requirement would impose a significant burden on national banks.  *See, e.g., Opinion & Order at 8 n.5.*  The BCA provides that foreign corporations are "subject to the same duties, restrictions, penalties, and liabilities now or later imposed on[] a domestic corporation of like character."  Ark. Code Ann. § 4-27-1505(b).[20]  Therefore, compliance with the BCA places a burden well beyond the mere act of registration.

---

[20] However, the Wingo Act is itself preempted.  *See supra* Part I.C.2.

Moreover, state laws may not "unfairly discriminate against national banks, favor state-chartered banks or frustrate, destroy, interfere with, or hamper national banks' exercise of their powers." *Burke*, 48 F. Supp. 2d 132, 138 (D. Conn. 1999) (citing *Barnett*, 517 U.S. at 33-34); *see Ass'n of Banks in Ins., Inc. v. Duryee*, 270 F.3d 397, 408 (6th Cir. 2001); *see also Watters*, 550 U.S. at 24 (Stevens, J., dissenting) (citing *Barnett*, 517 U.S. at 33). Congress has stated that one of the purposes of the NBA was to prevent unequal competition from state banks and resolve the "competitive tensions inherent in a dual banking structure" so that "neither system [has] advantages over the other." *Dickinson*, 396 U.S. at 131; *First Nat'l Bank of Logan*, 385 U.S. at 261; *Easton*, 188 U.S. at 229. Similarly, 12 U.S.C. § 25b(b)(1)(A), recently added to the NBA by the Dodd-Frank Act, preempts state consumer financial laws that, among other things, "would have a discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State."[21]

If the Court construes SFA § 18-50-117 as requiring state registration and approval, that could be withheld or revoked, before national banks can utilize the non-judicial foreclosure procedures, the SFA would impose an additional burden on national banks and effect the unequal competition that the NBA was intended to prevent.

Furthermore, and of equal significance, although state banks are able to conduct non-judicial foreclosures at will, national banks would not, unless approved by the state authority. Thus, as non-judicial foreclosures are much less time consuming and much less expensive than pursuing foreclosures through the judicial process, state banks would have a significant advantage over national banks. *See* Ark. Acts of 1987, No. 53 § 19 (Emergency Clause) (legislative finding that "the present laws regarding foreclosures are awkward, requiring

---

[21] The SFA falls within the NBA's broad definition of a state consumer financial law. *See* 12 U.S.C. § 25b(a)(2).

appraisals before the sale and giving the homeowner a one year statutory right of redemption that may not be waived; . . . [that the SFA] would provide an efficient and fair procedure for the liquidation of defaulted mortgage loans to the benefit of both the homeowner and the mortgage lender."); *see also Union Nat'l Bank of Arkansas v. Nichols*, 807 S.W.2d 36, 38 (Ark. 1991) (observing that "[t]he procedure is designed to be effectuated without resorting to the state's court system"); *Alliance Mortg. Co. v. Rothwell*, 900 P.2d 601, 607 (Cal. 1995) ("Nonjudicial foreclosure is less expensive and more quickly concluded than judicial foreclosure."); *California Golf, LLC v. Cooper*, 378 Cal Rptr. 3d 153, 168 (Cal. Ct. App. 2008) (one of the three goals of nonjudicial foreclosure statutes: "to provide the creditor/beneficiary with a quick, inexpensive and efficient remedy against a defaulting debtor/trustor") (internal quotations omitted); *Hallas v. Ameriquest Mortg. Co*., No. CV-04-433-HU, 2005 WL 2044523, at *8 (D. Or. Aug. 24, 2005) ("[T]he nonjudicial foreclosure process should remain efficient and inexpensive.") (citing Washington case law).  Additionally, such increased costs would necessarily either be passed to the consumer or taken as an expense by the bank – once again placing national banks at a competitive disadvantage.

Accordingly, to the extent that SFA § 18-50-117 requires JP Morgan to take any action beyond that mandated by the NBA to become authorized to do business in Arkansas, it is both expressly and implicitly preempted.  The bankruptcy court's finding that the SFA imposes little burden on a national bank because the bank may avail itself of traditional judicial foreclosure, even though "not . . . as efficient as the non-judicial foreclosure process," or merely become authorized to do business under the SFA is simply incorrect and demonstrates the court's fundamental misapprehension of the controlling law.  Opinion & Order at 21 & n.11.

III.     **The SFA Violates The Commerce Clause**

To the extent the SFA can be read to impose a registration or licensing requirement upon national banks, it also violates the Commerce Clause of the United States Constitution.[22]

"The Commerce Clause provides that '[t]he Congress shall have Power . . . [t]o regulate Commerce . . . among the several States.'" *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994) (quoting U.S. Const. Art. I, § 8, cl. 3). "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Id*.

The United States Supreme Court has "held that the first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Id*. (internal quotations omitted). "As we use the term here, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.  If a restriction on commerce is discriminatory, it is virtually per se invalid." *Id*.; *see R & M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 734 (8th Cir. 2002) ("A statute 'overtly discriminates' if it is discriminatory on its face, in its purpose, or through its effects.").

---

[22] JP Morgan recognizes that it did not explicitly raise the Commerce Clause issue below. This Court nevertheless has the power to consider this issue, and should do so.  When, as here, an argument raised on appeal "involves a purely legal issue in which no additional evidence or argument would affect the outcome of the case," the appellate court has discretion to consider it. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 891 (8th Cir. 2009) (quoting *Universal Title Ins. Co. v. United States*, 942 F.2d 1311, 1314 (8th Cir. 1991)).   The ability of states to regulate national banks is an important issue with ramifications beyond this case, and the constitutional issues that JP Morgan raises should not be dismissed without a full discussion.  As explained *infra* Part IV, JP Morgan had little notice these issues would be raised, there was no briefing, and oral argument was minimal.

On the other hand, "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970); *see Arkansas Tobacco Control Bd. v. Santa Fe Natural Tobacco Co., Inc.*, 199 S.W.3d 656, 660 (Ark. 2004). "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U.S. at 142.

The SFA discriminates against interstate commerce and is thus per se invalid. Alternatively, the SFA places an undue burden on interstate commerce, and the effects are clearly excessive in relation to the putative local benefits.

### A.    The SFA Overtly Discriminates Against National Banks

Assuming that the SFA imposes a registration requirement upon national banks, it discriminates on its face in favor of in-state banks. Specifically, the SFA treats national banks differently because, while in-state banks must register under, and are subject to, only the state statutory scheme, a national bank would be subject to both federal and state regulations before conducting non-judicial foreclosures. Thus, the SFA clearly imposes a greater regulatory burden upon national banks than it does upon in-state banks. *See Oregon Waste*, 511 U.S. at 100 ("[T]he purpose of, or justification for, a law has no bearing on whether it is facially discriminatory.").

Moreover, as discussed above, *supra* Part III, the ability to engage in non-judicial foreclosures provides state banks with a significant advantage over national banks. Non-judicial foreclosures require much less time and incur much less cost than pursuing foreclosures through

the judicial process.  Accordingly, the SFA discriminates by treating state banks and national

banks differently in a manner that benefits the former and burdens the latter.  *See Oregon Waste*,

511 U.S. at 98.

**B.      Even If The Discriminatory Effects Are Incidental, The
         Burden Imposed On Interstate Commerce Is Excessive
         In Relation To The Putative Local Benefits**

Even if the Court determines that the SFA is not *per se* discriminatory, the burden

imposed on interstate commerce far outweighs the putative local benefits.  If national banks are

forced to register with Arkansas regulatory officials, they will become subject to unnecessary

and duplicative state regulation that would severely hamper their ability to conduct nationwide

banking business as contemplated by the NBA.  As quoted in full above, the OCC recently

observed that "[t]he application of multiple, often unpredictable, different state or local

restrictions and requirements" to national banks "is costly and burdensome, interferes with their

ability to plan their business and manage their risks, and subjects them to uncertain liabilities and

potential exposure. In some cases, this deters them from making certain products available in

certain jurisdictions."  Bank Activities and Operations; Real Estate Lending and Appraisals, 69

Fed. Reg. 1904-1 (Jan. 13, 2004).

Here, for example, as a result of a registration requirement, a national bank, in addition to

being required to comply with OCC regulations, could become subject to the BCA and all

subsumed domestic corporation obligations.  These burdens upon interstate commerce become

magnified when one considers that each of the many national banks might have to register to do

business in every state that enacts similar provisions in their non-judicial foreclosure statutes.

*See, e.g.*, *Watters*, 550 U.S. at 14 ("Diverse and duplicative superintendence of national banks'

engagement in the business of banking . . . is precisely what the NBA was designed to

prevent . . . .").

The burden imposed upon interstate commerce by a registration requirement under the SFA outweighs any benefit that Arkansas would obtain by requiring national banks to register before conducting non-judicial foreclosures.  As discussed above, as national banks are thoroughly supervised by the federal government, and subject to the various rules, regulations, restrictions and enforcement power of the OCC, the concerns underlying § 18-50-117 of the SFA are not implicated and there is, in fact, no additional local benefit.

The provisions of § 18-50-102 provide additional protection.  Section 18-50-102 limits the parties authorized to conduct non-judicial foreclosures to Arkansas attorneys with an office in the state, financial institutions with a physical location in the state or state agencies.  *See* § 18-50-102(a).  These requirements ensure the protection of Arkansas citizens.  Accordingly, § 18-50-117's putative local benefit with regard to national banks cannot outweigh the effects of a registration requirement upon interstate commerce.  The SFA, therefore, to the extent it is read to impose a registration requirement, is unconstitutional under the Commerce Clause of the United States Constitution.

**IV.  The Bankruptcy Court Violated Bankruptcy Procedure And Deprived JP Morgan Of Due Process By Improperly Rejecting The Proof Of Claims**

Independent of the arguments set forth above, this Court should reverse the bankruptcy court's decision because JP Morgan was deprived of proper notice of the objections to JP Morgan's presumptively valid proofs of claim.  Pursuant to 11 U.S.C. § 502(a), "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."  Rule 3007(a) of the Federal Rules of Bankruptcy Procedure provides:

> An objection to the allowance of a claim <u>shall</u> be in writing and filed. A copy of the objection with notice of the hearing thereon *shall* be mailed or otherwise delivered to the claimant, the debtor or debtor in possession, and the trustee <u>at least 30 days prior to the hearing</u>.

(emphasis added).[23]   Moreover, the objection must give the claimant the reasons for the Debtors'

objection.  *See, e.g.*, 9 Collier on Bankruptcy ¶ 3007.01[3], at 3007-7 (16th ed. 2011).

Here, the Debtors never filed objections to JP Morgan's proofs of claim.  Debtors merely

filed responses to JP Morgan's plan confirmation objections ("Responses").  Those Responses

did nothing more than generally deny JP Morgan's objection.  Estes Dkt. No. 62; Johnson Dkt.

No. 100; Peeks Dkt. No. 57.  The Responses provided absolutely no information about the

reasons for the Debtors' refusal to account for JP Morgan's presumptively valid proofs of claim

in the Chapter 13 plans.  *Id.*  Moreover, the Responses were filed just days before the July 14,

2011 hearing that ultimately led the bankruptcy court to overrule JP Morgan's plan objections

and reject the proofs of claim.[24]  *Id.*

The cumulative effect was that JP Morgan had minimal, if any, time to prepare its

arguments, the significance of which is demonstrated by the arguments presented in this appeal.

JP Morgan was given neither adequate notice nor adequate time to prepare for a hearing that

attempted to seek far-reaching legal and financial effects.  *See supra* n.1.

---

[23] Although bankruptcy courts sometimes dispense with this requirement by litigating the validity of claims in the context of plan confirmation, *see, e.g.*, *FDIC v. Union Entities (In re Be-Mac Transport Co.)*, 83 F.3d 1020, 1026-27 (8th Cir. 1996), numerous courts have held that dispensing with the requirement is improper, especially where, as here, the proofs of claim are necessarily filed after the plan, *see, e.g.*, *Univ. Am. Mortg. Co. v. Bateman (In re Bateman)*, 331 F.3d 821, 828 (11th Cir. 2003) (confirmation of plan cannot effect a disallowance of a claim to which no Rule 3007 objection was made); *Simmons v. Savel (In re Simmons)*, 765 F.2d 547, 552 (5th Cir. 1985) (same).

[24] Similarly, just three days before the hearing, Debtors in two of the three bankruptcy proceedings provided responses to JP Morgan's interrogatories that failed to provide any reasonable understanding of the Debtors' Responses to JP Morgan's plan objections.  Although the interrogatory responses claim that JP Morgan's foreclosure fees and costs "are not collectable as the foreclosure was not conducted in strict compliance with the Arkansas Statutory Foreclosure Act pursuant to ACA § 18-50-116," *see* Estes Response at 5, nowhere do Debtors claim that JP Morgan was not "authorized to do business" in Arkansas under § 18-50-117.

Moreover, a claim may not be extinguished or modified without affording the creditor due process.  *See, e.g.*, *Sanchez v. Northwest Airlines, Inc*., 659 F.3d 671, 675 (8th Cir. 2011). Due process requires, at a minimum, "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Id*. (quoting *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314-15 (1950)).   Here, even construing the vague answers in interrogatories in just two of the three bankruptcy proceedings as notice of the Debtors' intention to use the plan confirmation hearing to litigate JP Morgan's right to employ the SFA's non-judicial foreclosure procedures, it fails to comport with due process.  *See, e.g.*, *In re Miller*, 140 B.R. 499, 501-02 (Bankr. E.D. Ark. 1992) ("[A]n order confirming a plan is subject to collateral attack for lack of due process guaranteed under the Fifth Amendment to the United States Constitution where a creditor does not receive reasonable notice of an opportunity to appear and be heard.").[25]

## V.      The Bankruptcy Court Erred In Awarding Debtors Their Attorneys' Fees

The bankruptcy court improperly awarded the Debtors an undetermined amount of attorneys' fees.  *See* Opinion & Order at 22.  In so doing, the bankruptcy court misapplied the relevant law[26]

Although the bankruptcy court acknowledged that "[a]s a general rule, known as the 'American rule,' the parties to litigation must pay their own attorney fees," Opinion & Order at 22, it based its award of attorneys' fees upon an Arkansas statute providing that

---

[25] If remanded, JP Morgan reserves its right to move the district court to withdraw the reference to the bankruptcy court pursuant to 28 U.S.C. § 157 on any proof of claim objection and have the matter consolidated with other, related litigation pending before the District Court.

[26] The attorneys' fees issue is currently being litigated before the bankruptcy court in the context of the Debtors' motions to approve fees and costs.

> In any civil action to recover on an open account, statement of account, account stated, promissory note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

Ark. Code Ann. § 16-22-308.

This provision, however, applies only to actions related to the "purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action." *Id.* The instant proceedings do not qualify under any of the enumerated categories.

The only type of action listed that is even arguably relevant is one for breach of contract. However, there are no breach of contract claims present in these cases. Even where the allegations in an action relate in some way to a contract, § 16-22-308 does not apply if the claims themselves are not for breach of contract. *See, e.g.*, *Hanners v. Giant Oil Co.*, 284 S.W.3d 468, 475 (Ark. 2008) (finding that circuit court erred in awarding attorneys' fees under § 16-22-308 where complaint did not allege breach of contract, but rather sought only to "obtain a declaratory judgment concerning the rights, status and legal relations" of the parties to a lease agreement). In any other type of action, including actions alleging statutory violations, § 16-22-308 does not apply. *See Nationsbanc Mortg. Corp. v. Hopkins*, 114 S.W.3d 757, 766 (Ark. App. 2003) (declining to award attorneys' fees under § 16-22-308 in an action alleging mortgagee's violation of a statutory duty to record, given that the claim, although related to a mortgage contract, was essentially one "for violation of a statute and possibly negligence[,] [n]either of [which] support an attorney fee award under section 16-22-308").

Here, although Debtors' claims relate to mortgage loan contracts, there has been no allegation that the terms of those contracts have been breached by either JP Morgan or Chase.

To the contrary, as found by the bankruptcy court, "[t]he only question in each of these three cases is whether the foreclosure fees and costs are allowed by the controlling law." Opinion & Order at 5. Accordingly, the Debtors are not entitled to an award of attorneys' fees.

## CONCLUSION

For the reasons stated herein, Appellant J.P. Morgan Chase Bank, N.A. respectfully requests that this Court reverse the decision of the bankruptcy court in its entirety, order the bankruptcy court to sustain Appellant's objections to plan confirmation filed in the Debtors' respective bankruptcy proceedings, and for such further relief as this Court deems just and proper.

Respectfully submitted,

By: _____/s/ Daniel S. Connolly_____

DAVID L. WILLIAMS, 78168
KATHERINE M. HINGTGEN, 2006223
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201
(501) 975-3000 (t)
(501) 975-3001 (f)
david.williams@kutakrock.com
katherine.hingtgen@kutakrock.com

DANIEL S. CONNOLLY, 2265569
RACHEL B. GOLDMAN, 2896272
BRACEWELL & GIULIANI, LLP
1251 Avenue of the Americas, 49th Floor
New York, New York 10020-1104
(212) 508-6100 (t)
(212) 508-6101 (f)
daniel.connolly@bgllp.com
rachel.goldman@bgllp.com

SAMUEL M. STRICKLIN, 19397050
BRACEWELL & GIULIANI, LLP
1445 Ross Avenue, Suite 3800
Dallas, Texas 75202-2711
(214) 468-3800 (t)
(214) 468-3888 (f)
samuel.stricklin@bgllp.com

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that on January 12, 2012, I electronically filed with the Clerk of Court using the CM/ECF system on all parties and those otherwise entitled to service at the addresses set forth below:

Joel G. Hargis
CRAWLEY DELOACHE & HARGIS, PLLC
533 West Washington Avenue
Jonesboro, AR 72401

Scott E. Poynter
EMERSON POYNTER LLP
500 President Clinton Avenue, Suite 305
Little Rock, AR 72201

Michael Edward Crawley, Jr.
CRAWLEY & DELOACHE, PLLC
533 West Washington Avenue
Jonesboro, AR 72401

G. Michael DeLoache (by U.S. Mail)
CRAWLEY & DELOACHE, PLLC
533 West Washington Avenue
Jonesboro, AR 72401

Kathy A. Cruz
THE CRUZ LAW FIRM
1325 Central Avenue
Hot Springs, AR 71901

COUNSEL FOR APPELLEE

Mark Thomas McCarty
Office of the Chapter 13 Trustee
Post Office Box 5503
North Little Rock, AR 72119
(501) 801-5630
mmccarty@ch13ark.com

*/s/ Daniel S. Connolly*
Daniel S. Connolly